951 So.2d 784 (2006)
Paul HILDWIN, Appellant,
v.
STATE of Florida, Appellee.
SC04-1264.
Supreme Court of Florida.
December 14, 2006.
Rehearing Denied March 7, 2007.
*785 John W. Jennings, Capital Collateral Regional CounselMiddle Region, David *786 Dixon Hendry and Mark S. Gruber, Assistant CCR Counsel, Tampa, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Kenneth S. Nunnelley, Senior Assistant Attorney General, Daytona Beach, FL, for Appellee.
Nina Morrison and Barry C. Scheck, New York, New York, on behalf of The Innocence Project, Inc.; and Milton Hirsch of Hirsch and Markus, LLP, Miami, FL, on behalf of The Florida Association of Criminal Defense Lawyers, Miami Chapter, for Amicus Curiae.
PER CURIAM.
Paul Hildwin appeals the denial of a motion to vacate his conviction of first-degree murder and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. Hildwin challenges the trial court's rulings on four issues: (1) denial of a new trial and new penalty phase based on newly discovered DNA evidence that excludes him as the source of semen on underpants and saliva on a wash cloth found at the top of a laundry bag in the victim's car; (2) exclusion of the results of "mock jury" presentations conducted using the new evidence; (3) denial of a new trial on grounds that the evidence suggesting he raped the victim constituted a fatal variance from or constructive amendment of the indictment; and (4) cumulative error. For the reasons that follow, we affirm the denial of his motion on each of these grounds.

PROCEDURAL HISTORY
This is Hildwin's first postconviction appeal since this Court affirmed the death sentence imposed upon resentencing. Hildwin's original judgment and sentence of death were affirmed on direct appeal. See Hildwin v. State, 531 So.2d 124 (Fla. 1988), aff'd, 490 U.S. 638, 109 S.Ct. 2055, 104 L.Ed.2d 728 (1989). In Hildwin's previous postconviction appeal, we affirmed the denial of Hildwin's postconviction motion in respect to his conviction but granted a new penalty phase. See Hildwin v. Dugger, 654 So.2d 107 (Fla.1995). In the new penalty phase, Hildwin again received a sentence of death, and this Court affirmed the sentence. See Hildwin v. State, 727 So.2d 193 (Fla.1998).[1]

FACTS OF THE CRIME
The following facts of the crime are set out in our opinion in Hildwin, 531 So.2d at 125-26:
Appellant was arrested after cashing a check purportedly written to him by one Vronzettie Cox, a forty-two-year-old woman whose body had been found in the trunk of a car, which was hidden in dense woods in Hernando County. Death was due to strangulation; she also had been raped. Evidence indicated she had been killed in a different *787 locale from where her body was found. Her purse, from which some contents had been removed, was found in dense woods, directly on line between her car and appellant's house. A pair of semenencrusted women's underpants was found on a laundry bag in her car, as was a sweat-stained wash rag. Analysis showed the semen and sweat came from nonsecretor (i.e., one who does not secrete blood into other bodily fluids). Appellant, a white male, was found to be a nonsecretor; there was testimony that white male nonsecretors make up eleven percent of the population.
The victim had been missing for four days when her body was found. The man she lived with, one Haverty, said she had left their home to wash clothes at a coin laundry. To do so, she had to pass a convenience store. Appellant's presence in the area of the store on the date of her disappearance had come about this way: He and two women had gone to a drive-in movie, where they had spent all their money. Returning home early in the morning, their car ran out of gas. A search of the roadside yielded pop bottles, which they redeemed for cash and bought some gasoline. However, they still could not start the car. After spending the night in the car, appellant set off on foot at 9 a.m. toward the convenience store near the coin laundry. He had no money when he left, but when he returned about an hour and a half later, he had money and a radio. Later that day, he cashed a check (which he later admitted forging) written to him on Ms. Cox's account. The teller who cashed the check remembered appellant cashing it and recalled that he was driving a car similar to the victim's.
The check led police to appellant. After arresting him the police searched his house, where they found the radio and a ring, both of which had belonged to the victim. Appellant gave several explanations for this evidence and several accounts of the killing, but at trial testified that he had been with Haverty and the victim while they were having an argument, and that when Haverty began beating and choking her, he left. He said he stole the checkbook, the ring, and the radio. Haverty had an alibi for the time of the murder and was found to be a secretor.
Appellant made two pretrial statements that are pertinent here. One was a confession made to a cellmate. The other was a statement made to a police officer to the effect that Ms. Cox's killer had a tattoo on his back. Haverty had no such tattoo, but appellant did.

PRESENT RULE 3.851 MOTION
In 2002, pursuant to Florida Rule of Criminal Procedure 3.853, Hildwin's post-conviction counsel obtained an order permitting DNA testing of the underpants and wash cloth identified at trial as containing bodily fluids of a nonsecretor such as Hildwin. In January 2003, Orchid Cellmark, a laboratory certified by the American Society of Crime Laboratory Directors, issued a report excluding Hildwin as the source of the DNA obtained from the underpants and wash cloth. Hildwin then moved for postconviction relief, asserting inter alia that the newly discovered DNA results demonstrated his actual innocence or would result in his acquittal or a lesser sentence. In a written order, the trial court denied the motion.

Issues 1 and 3: Newly Discovered DNA Evidence and Fatal Variance Between Indictment and Proof
In his first argument on appeal, Hildwin maintains that newly discovered DNA evidence shows that Hildwin is actually innocent of the crime or, in the alternative, that in light of the new DNA evidence, Hildwin would probably be acquitted on *788 retrial or would not receive a sentence of death. In his third argument, Hildwin maintains that there were fatal variances between the indictment and proof because he was only indicted on a charge of first-degree murder but eventually was tried for a charge of sexual battery not alleged in the indictment. Hildwin's claims center upon the DNA evidence showing that it was not Hildwin's semen on the underwear or secretions on a rag that were found in the victim's car following the murder.
In denying Hildwin's postconviction motion, the circuit court expressly pointed out: "This matter was never prosecuted as a rape case." State v. Hildwin, No. 85-499-CF at 3 (Fla. 5th Cir. Ct. order filed May 3, 2004) (Postconviction Order). The circuit court's order then states in respect to Hildwin's argument 1:
(1) There is no basis to Defendant's claim that the newly discovered DNA evidence shows that he is innocent of the crime, or that he would probably be acquitted on retrial, pursuant to Jones [v. State, 709 So.2d 512 (Fla.1998)]. In fact, in this Court's Order on Defendant's Motion for Postconviction DNA Testing, entered on June 10, 2002, wherein DNA testing of four items of evidence was authorized, this Court specifically omitted language that indicated that there was a reasonable probability that the movant would have been acquitted or would have received a lesser sentence if DNA evidence had been admitted at trial. The DNA testing indicates that the semen and saliva on the panties and washcloth did not come from the Defendant. Pursuant to the standards set forth in Jones, the Court must reweigh the DNA evidence and analyze it along with the evidence presented at trial. This Court has done so, and has determined that an acquittal would NOT be probable on retrial, even taking into consideration the newly discovered DNA evidence, which does NOT show that the Defendant is innocent of the crime charged; and
(2) Defendant goes into extensive discussion regarding cases where DNA testing was denied, but that is inapplicable here. This Court granted Defendant's request for DNA testing, and although the results indicate that the semen and saliva on the items found on the laundry bag in the victim's car were not Defendant's, that does not translate into a reasonable probability that Defendant would have been acquitted had that DNA evidence been available at trial; and
(3) Defendant alleges the only remaining evidence of guilt is a statement from a "lying jailhouse snitch" who testified for the State; however, he neglects to mention considerable testimony and numerous factors presented at trial which resulted in his conviction, as contained in the trial transcript, including:
 The testimony of a cellmate who alleged that Defendant admitted that he had killed the victim and that he was going to "burn" for the murder.
 The victim's purse, with some items removed, which was found in the woods where her car was located, as well as her shoes and a piece of moulding [sic] from her car, all located in a direct line between her car and the Defendant's house.
 Testimony that Defendant had no money when he left his disabled car roadside and walked toward a convenience store in the area where the victim was traveling, returning to his car approximately 1 1/2 hours later with money which he subsequently used to purchase gas.
 Testimony that Defendant cashed a check drawn on the victim's bank account, which he later admitted he stole *789 from her purse and forged and cashed it.
 Testimony indicating that the teller who cashed the forged check identified the Defendant as the person who cashed it, and that he was driving a car at the time that was similar to the description of the victim's car.
 Testimony that the forged check led police to the Defendant; and a search of his house turned up a radio and a ring, both of which belonged to the victim.
Postconviction Order at 3-5.
Based upon the record, we find no error in the circuit court's holding.
We do agree with Hildwin that the DNA evidence was newly discovered evidence. We further agree that the newly discovered DNA evidence, which refutes the trial serology evidence by establishing that Hildwin's bodily fluids were not on the panties and wash cloth, is a significant new fact which must be evaluated in determining whether Hildwin is entitled to a new trial.
However, the trial court correctly analyzed the DNA evidence using the standard we set out in Jones v. State, 709 So.2d 512 (Fla.1998). In Jones at 521, we stated:
[T]he newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. Jones, 591 So.2d at 911, 915. To reach this conclusion the trial court is required to "consider all newly discovered evidence which would be admissible" at trial and then evaluate the "weight of both the newly discovered evidence and the evidence which was introduced at trial." Id. at 916.
Although the newly discovered DNA evidence is significant, this evidence is not "of such nature that it would probably produce an acquittal on retrial."
Our review of the guilt-phase trial record supports the trial court's conclusion: "This matter was never prosecuted as a rape case." The prosecutor did not argue to the jury that Hildwin had sexually assaulted the victim. The trial court did not instruct the jury on sexual battery as an underlying felony for first-degree murder. This case is unlike the case of House v. Bell,___ U.S. ___, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), to which the dissent refers, in that in House, the State argued that the murder was committed while House was engaged in a rape, and the jury found as an aggravator that the murder was committed while engaged in a rape or kidnapping.[2] Absent the serology evidence, other overwhelming evidence of guilt that also places Hildwin at the crime scene does not imply that Hildwin committed a sexual battery. This extensive and basically unrebutted evidence renders it improbable that the newly discovered DNA evidence would result in an acquittal on retrial. See Robinson v. State, 770 *790 So.2d 1167, 1170 (Fla.2000) (discussing the required "cumulative analysis by evaluating the newly discovered evidence in conjunction with evidence presented at all prior evidentiary hearings and evidence presented at trial") (citing Jones, 709 So.2d at 522).
As the trial judge sets forth, competent, substantial evidence presented at trial includes: (1) the testimony of a cellmate that Hildwin admitted to committing the murder; (2) items belonging to the victim were located in a direct line between the car of the victim and the house in which Hildwin was living at the time of the murder; (3) items which belonged to the victim were found in the house of Hildwin; (4) Hildwin admitted that he stole a check from the purse of the victim, subsequently forging and cashing it; (5) testimony of a bank teller that the person who forged the check was Hildwin and that at the time Hildwin was driving a car that fit the description of the victim's car; (6) information from Hildwin's driver's license showed to the teller at the time of cashing the check was from Hildwin's driver's license; and (7) testimony that Hildwin had no money when he left his disabled car on the side of the road and walked toward a convenience store in the area where the victim was traveling, returning to his car approximately an hour and a half later with money. In view of this evidence and the entire guilt-phase evidence, although the serology evidence could have contributed to Hildwin's conviction, we do not agree with the dissent that it was a "scientific building block" upon which the State's entire case was built. Dissenting op. at 790.
Nor do we conclude that the DNA evidence would probably result in Hildwin not receiving the death sentence. Following the 1996 resentencing, the trial court entered a detailed order in which the trial court found that Hildwin's primary motivation for the murder was pecuniary gain. The focus of the resentencing was not on any sexual component of the crimes. The secretor/non-secretor evidence was not presented at the resentencing. See Hildwin, 727 So.2d at 195 n. 1 ("[N]o evidence of a sexual encounter, consensual or otherwise, was presented at resentencing, and we do not consider it here."). Sexual assault was not found to be an aggravator. Nor was sexual assault found to be a part of the basis for the HAC aggravator. HAC was based upon the fact that the victim's death was by strangulation, which would have taken several minutes to cause death.
We thus conclude that the postconviction court did not err and affirm its denial of Hildwin's claims on Hildwin's issues 1 and 3.

Issue 2. Exclusion of Mock Jury Evidence
In an attempt to establish to the circuit court that the DNA evidence would probably have led to acquittal, Hildwin sought to introduce evidence from a mock jury trial conducted on his behalf. He presented expert opinion testimony by a Ph.D. psychologist, Dr. Harvey Moore, as well as the results of mock trials conducted with and without reliance on the DNA results to support Moore's testimony. The State opposed the circuit court's consideration of this evidence on grounds that it invaded the province of the court on a legal question and did not meet the Frye[3] test of admissibility for novel scientific evidence. The circuit court excluded the evidence on those grounds and also because of a lack of precedent supporting admission of mock trial results as substantive evidence.
*791 Trial court rulings on the admissibility of evidence are generally reviewable for abuse of discretion. Ray v. State, 755 So.2d 604, 610 (Fla.2000); Alston v. State, 723 So.2d 148, 156-57 (Fla.1998). In this case, the circuit court excluded the opinion testimony, report, and mock trial videotapes without an evidentiary hearing and based solely on the arguments of the parties and supporting documentation. Because these materials are available to this Court in the same form, the level of deference generally accorded a trial court's findings of fact does not apply. See Parker v. State, 873 So.2d 270, 279 (Fla. 2004). Further, the circuit court excluded the evidence on the basis of legal conclusions drawn from the arguments of the parties and written material submitted to the court. This Court has held that the "de novo" standard, not abuse of discretion, applies to the trial court's determination under Frye as to whether both the scientific principle and the testing procedures applying the procedure to the case at hand are generally accepted in the relevant community. Ramirez v. State, 651 So.2d 1164, 1168 (Fla.1995). The de novo standard is applied to promote uniformity and predictability in the admission of scientific evidence because "the general acceptance issue transcends any particular dispute." Brim v. State, 695 So.2d 268, 274 (Fla.1997) (quoting People v. Miller, 173 Ill.2d 167, 219 Ill.Dec. 43, 670 N.E.2d 721, 739 (1996) (McMorrow, J., specially concurring)). Accordingly, we review the circuit court's exclusion of this evidence de novo.
We affirm the circuit court's ruling for three reasons. First, the opinion testimony is inadmissible under section 90.702, Florida Statutes (2005), which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify about it in the form of an opinion; however, the opinion is admissible only if it can be applied to evidence at trial.
(Emphasis added.) A postconviction court determining whether newly discovered evidence warrants a new trial is not a "trier of fact" who would be assisted by expert opinion testimony under this provision. Rather, once it is clear that admissible newly discovered evidence exists, the court's determination whether this evidence would probably result in acquittal is an evaluation of facts previously developed to determine whether it meets a legal threshold.
Several courts have relied on mock trial results in determining the admissibility of a particular type of evidence or evaluating rules of procedure and evidence. See State v. Porter, 241 Conn. 57, 698 A.2d 739, 770 n. 61 (1997) (referring to mock trial results in deciding to maintain rule that polygraph results are per se inadmissible); People v. Allen, 429 Mich. 558, 420 N.W.2d 499 (1988) (considering mock trial studies in deciding to clarify and amend rules of evidence and procedure on prior conviction impeachment). However, Hildwin has not cited any precedent relying on expert opinion testimony gleaned from mock trial results for the purpose of determining whether a particular legal standard has been met in a specific case. Accordingly, the circuit court correctly declined to consider the opinion testimony of Dr. Harvey Moore in ruling on Hildwin's newly discovered evidence claim. Further, the remaining evidence submitted by Hildwin, including the videotapes, trial scripts, and Dr. Moore's report, are unsworn evidence inadmissible independent of Moore's testimony.
*792 Assuming that opinion testimony derived from mock trial results is admissible on this issue under section 90.702, this evidence was nevertheless inadmissible under Frye. A trial judge applying the Frye standard "must decide whether the expert's testimony is based on a scientific principle or discovery that is `sufficiently established to have gained general acceptance in the particular field in which it belongs.'" Ramirez v. State, 651 So.2d 1164, 1167 (Fla.1995) (quoting Frye, 293 F. at 1014). Reliability is the primary criterion for general acceptance: "The principal inquiry under the Frye test is whether the scientific theory or discovery from which an expert derives an opinion is reliable. We have not hesitated to utilize the Frye test to reject expert testimony concerning subjects that have not been proven to be sufficiently reliable." Id. In Hadden v. State, 690 So.2d 573 (Fla.1997), the Court stated:
In sum, we will not permit factual issues to be resolved on the basis of opinions which have yet to achieve general acceptance in the relevant scientific community; to do otherwise would permit resolutions based upon evidence which has not been demonstrated to be sufficiently reliable and would thereby cast doubt on the reliability of the factual resolutions.
Id. at 578.
Hildwin has not demonstrated the reliability of mock trial results in predicting legal outcomes. The material submitted by Hildwin below, consisting largely of articles and abstracts from legal and scholarly journals, reveals that the results of mock trials have been relied upon for two purposes. First, trial lawyers have used mock jury trials in determining whether to take a case to trial and in preparing for trial. Second, social scientists have used the results in an attempt to reach a better understanding of the operation of the justice system as a whole. However, none of this material demonstrates use or general acceptance of mock juries in predicting whether new or different evidence would change the results in previously tried cases, the purpose for which the mock trial evidence was offered in this case.
Hildwin argues on appeal that "[a]rticles have been written which state that mock trials are very accurate indicators of actual trial results." However, the only support provided for this assertion is a 1988 American Bar Association Journal symposium in which two trial lawyers and two jury research consultants answer questions about the use of mock jury trials by litigators. See David Gidmark, The Verdict on Surrogate Jury Research, ABA J. (Mar. 1, 1988) at 82. In the article, the attorneys and consultants describe mock jury trials as accurately predicting trial results and give anecdotal support. This is not sufficient evidence of reliability and general acceptance in predicting trial results to meet the Frye standard.
Finally, assuming general admissibility under section 90.702 and general acceptance of the underlying scientific principle pursuant to Frye, the mock trials conducted in this case diverged from evidence pertinent under the Jones test for determining whether newly discovered evidence warrants a new trial. This conclusion, drawn from the scripts of the mock trials, makes both the results and any opinion derived from those results unreliable.
The mock trials were condensed from the original trial transcript. The State's case in Hildwin's trial lasted five days, covered more than 500 transcript pages, and involved sixty-one exhibits. In contrast, in the simulation, the prosecution's case consumed less than an hour, did not include any actual witness testimony, and featured only two exhibits. Moore acknowledged in his report that simulations are "much less powerful and persuasive *793 than the original trial." In addition, the simulation script for the original trial reflects that the State asserted in its final closing argument: "This was a rape murder. I ask you to bring back a verdict of guilty of first degree murder." In Hildwin's actual trial, the State never argued that Hildwin raped the victim.
Because the simulated trial included substantial information that was neither newly discovered nor demonstrated to be admissible, contrary to the Jones standard, and presented that evidence in the light most favorable to the defense, the results are not reliable. The mock jury results and opinion testimony derived therefrom have little or no probative value, and any probative value was substantially outweighed by the potential for prejudice or confusion of issues, justifying exclusion under section 90.403.
For each of the reasons discussed, the trial court did not err in excluding the mock trial evidence and expert opinion thereon.

Issue 4. Cumulative Error
Since we find no errors on the part of the circuit court, we find no basis for relief on this argument.

CONCLUSION
We have carefully reviewed the record and find no error in respect to the postconviction court's denial of the Amended Successive Motion to Vacate Judgment of Conviction and Sentence. We therefore affirm.
It is so ordered.
LEWIS, C.J., and WELLS, CANTERO, and BELL, JJ., concur.
PARIENTE, J., dissents with an opinion, in which ANSTEAD and QUINCE, JJ., concur.
PARIENTE, J., dissenting.
Justice demands a new trial for Hildwin, one free of the tainted evidence used to convict him of first-degree murder and sentence him to death. Although the DNA results do not establish Hildwin's innocence, this newly discovered evidence would have struck three blows for reasonable doubt and therefore likely led to an acquittal. The new evidence would have contradicted the State's theories that Hildwin raped Cox and that he implicitly confessed when he told police the killer wiped his face with a white rag, and would have made Hildwin's trial testimony pointing to the victim's boyfriend as the killer more plausible.
Unlike newly discovered evidence claims involving alleged witness recantations and hearsay accounts that someone other than the defendant committed the murder, the DNA evidence in this case excluding Hildwin as the source of the saliva and semen is objective, precise, and inherently reliable. In its recent decision in House v. Bell, ___ U.S. ___, 126 S.Ct. 2064, 165 L.Ed.2d 1 (2006), the United States Supreme Court recognized both the tremendous impact of DNA evidence in counteracting serology evidence and the devastating effect of a rape accusation in a murder prosecution.
House, which was decided while this case was pending in our Court, also involved semen on the victim's clothing that seemingly matched the defendant, according to the evidence at trial. Subsequent DNA testing excluded House as the source of the semen. In a five-to-three decision, the Court concluded that, "had the jury heard all the conflicting testimony[,] it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." Id. at 2086. The Court stated that "[l]aw and society, as they ought to do, demand accountability *794 when a sexual offense has been committed, so not only did this evidence link House to the crime; it likely was a factor in persuading the jury not to let him go free." Id. at 2079. Accordingly, "[w]hen the only direct evidence of sexual assault drops out of the case, so, too, does a central theme in the State's narrative linking House to the crime." Id. at 2079.
Like House, this is a capital case in which the decision whether to grant the defendant a new trial based on newly discovered DNA evidence turns on a thin margin. Although House is distinguishable in that the evidence against Hildwin also shows a theft motive, the serology evidence nonetheless played a significant role in the State's proof of Hildwin's guilt. This evidence led members of this Court and probably also the jurors to conclude that Hildwin raped Cox, enabled the State to discredit Hildwin's trial testimony pointing to a different suspect, and supported an argument that Hildwin had made an implicit confession. The newly discovered DNA evidence negates each of these uses of the serology evidence, leading me to conclude that, more likely than not, a jury hearing all of the contradictory evidence in this case would have voted to acquit Hildwin of first-degree murder.
In deciding to the contrary, the majority applies what in my view is an incorrect standard. A court evaluating newly discovered evidence claims must "evaluate the weight of both the newly discovered evidence and the evidence which was introduced at trial." Jones v. State, 591 So.2d 911, 916 (Fla.1991). In this case, the majority merely subtracts the serology evidence from the State's case and then relies on other "overwhelming" evidence of guilt. Majority op. at ___. Rather than assess the probability of acquittal after revising the State's case in light of the new evidence, this Court should follow both House, 126 S.Ct. at 2086, and its own precedent in Jones by considering the likely effect on the jury's verdict of both the new evidence and the evidence presented at trial.
In the discussion that follows, I explore the three areas in which the newly discovered evidence would have contributed to reasonable doubt of Hildwin's guilt.

No Longer a Rape Case
The State clearly relied on the serology evidence to imply that Hildwin raped Cox. In opening statement, the prosecution previewed this aspect of its case as follows:
[Police] found a bag of dirty laundry in the car. . . . Finally taken from that laundry bag was a pair of women's clothing sitting on top of the laundry bag, a pair of women's panties and a wash rag. Now on those women's panties was some semen and it has the same blood characteristics that the defendant has. And there will be an expert from the FBI to testify to you about that. On the wash rag there are characteristics of human sweat that is consistent with this defendant.
In addition to the testimony that the saliva on the wash cloth and semen on the underpants were deposited by a nonsecretor such as Hildwin, the State introduced a tattered brassiere found in Cox's purse, which had been abandoned in woods on a line between Cox's car and Hildwin's residence, and a photograph reflecting that Cox's body was discovered naked with her legs raised and genital area exposed. In closing argument, the prosecutor pointed to the condition of the brassiere to argue that any sexual encounter between Cox and her murderer had not been consensual, as defense counsel had suggested. After recounting the scientific evidence concerning secretors and nonsecretors, the prosecutor stated:
What's interesting about that is that on these panties that were found  these *795 panties were found in the car on top of the laundry, Sergeant Haygood testified to, not in the laundry, on top of the laundry. These panties contained semen that is consistent with the non-secretor 11 percent of the white male population, consistent with the defendant in this case and not consistent with Bill Haverty. This wash rag had saliva from a non-secretor consistent with Paul Hildwin, the defendant, not consistent with Bill Haverty.
And before we go any further, remember the statement that the defendant made to Investigator Phifer that after  after Vronzettie Cox was choked to death, the man that did it wiped his face with a white rag. Now, these two pieces of evidence, ladies and gentlemen, I'm not asking you in any way, shape, or form to convict the defendant, Paul Hildwin, based on those panties and that wash rag. What I am telling you is that it is one more block. It is one more piece of evidence that leads to Paul Hildwin, and it is one more piece of evidence that eliminates Bill Haverty. While that 11 percent of the population are non-secretors, remember it would have to be a non-secretor like the defendant in the same place at the same time with the same opportunity to be the same because it makes those odds look high for someone other than the defendant.

(Emphasis supplied). Perhaps the State did not prosecute this as a rape case, as the majority concludes, but the prosecution clearly used evidence of rape to prosecute its case for murder.
This Court's opinion in Hildwin's direct appeal demonstrates the impact of the serology evidence. Although the State did not charge Hildwin with sexual battery and the trial court did not instruct the jury on sexual battery as an underlying felony for first-degree felony murder, this Court stated twice that Cox had been raped, first in an introductory paragraph setting out the facts, then in discussing the "especially heinous, atrocious, or cruel" aggravator. See Hildwin v. State, 531 So.2d 124, 125 (Fla.1988); ("Death was due to strangulation; she also had been raped."); id. at 128 ("the evidence points convincingly to a conclusion that the appellant abducted, raped, and slowly killed his victim").[4]
The serology evidence almost certainly led Hildwin's jury, as it did this Court, to the conclusion that Hildwin raped Cox. The condition of the victim's body alone would have prompted jurors to question whether she had been raped.[5] The serology evidence made the issue unavoidable, prompting defense counsel to assert in closing argument a dubious theory that Cox was killed during consensual intercourse involving oxygen deprivation. The prosecutor's rebuttal argument that the victim's damaged brassiere demonstrated that any sexual encounter was nonconsensual provided a much more credible explanation of the serology evidence and the condition of the victim's body than the defense hypothesis.
A DNA-based refutation of the State's assertion that Hildwin deposited the semen on Cox's underpants would have profoundly affected jury deliberations. In this case, the serology testimony of the FBI analyst placing Hildwin within the *796 percentage of the population that could have deposited the semen and saliva on clothing in the victim's car, where the body was found, almost certainly made a substantial impression on the jury. The newly discovered DNA evidence establishing that Hildwin was not the source of the semen and saliva would have had an even greater impact, given the high degree of certainty and reliability in a DNA exclusion. The DNA evidence would have severed a link between Hildwin and the murder and contradicted the strong implication that Hildwin committed a brutal rape.

Support for Defense Theory
In addition, the DNA evidence excluding Hildwin as the source of the semen would have supported his testimony that William Haverty, Cox's boyfriend, killed her during an argument over her seeing other men. Hildwin testified that after he obtained a ride from Cox and Haverty, he stole Cox's possessions from her car while Haverty attacked her. The serology evidence presented at trial excluded Haverty as the source of the saliva and semen. Therefore, the semen was deposited in Cox's underpants by a third man. At trial, Haverty testified that Cox had gone out with other men while the two were living together, and that he "didn't like it a whole lot." Hildwin testified that Haverty became violent during the argument over Cox's behavior, striking and choking her. Hildwin further testified that after attempting unsuccessfully to separate Haverty from Cox, he took Cox's checkbook and rings and fled.
Although Haverty had an alibi, it was not ironclad. The alibi witness, George Weeks, testified that Haverty was present at home when Weeks came to mow the lawn on what could have been the morning of Cox's disappearance. However, Weeks' testimony did not match Haverty's as to the day that Weeks mowed the lawn. Weeks testified that he saw Haverty on Monday or Tuesday after the weekend that Haverty and Cox moved into the trailer, which would have been September 2nd (Labor Day) or 3rd, 1985. Haverty testified Weeks actually mowed the lawn a week later, September 9th, the day of Cox's disappearance. Clearly, one of the men was incorrect.
Further, in postconviction proceedings in 1992, an envelope with writings by Haverty found in the home he shared with Cox came to light. This piece of evidence is relevant to an analysis of the cumulative effect of newly discovered evidence. See Robinson v. State, 770 So.2d 1167, 1170 (Fla.2000) (explaining that trial court must "evaluat[e] the newly discovered evidence in conjunction with evidence presented at all prior evidentiary hearings and evidence presented at trial"); State v. Gunsby, 670 So.2d 920, 924 (Fla.1996) (granting a new trial on the basis of the combined effect of newly discovered evidence, the erroneous withholding of evidence, and ineffective assistance of counsel). Among other messages, Haverty wrote to the victim "If you don't want to be here, leave," and "Fuck off and die." The envelope could have been used to impeach Haverty's testimony that he and Cox "got along real good" at the time of her disappearance.

Refutation of Implied Confession
The DNA evidence would also have undermined the State's argument that Hildwin made an implied confession to a police detective when he stated that the actual killer wiped his face with a white rag. At trial, the State used the statement in closing argument to suggest that Hildwin was actually speaking of his own actions in committing the murder:
This wash rag had saliva from a non-secretor consistent with Paul Hildwin, the defendant, not consistent with Bill Haverty. And before we go any further, *797 remember the statement that the defendant made to Investigator Phifer that after  after Vronzettie Cox was choked to death the man that did it washed his face with a white rag.
Exclusion of Hildwin as the source of the saliva would have stripped this argument of its basis in the serology evidence and thereby given Hildwin's statement that he was not the killer greater credence.

Conclusion
As in House, this is "not a case of conclusive exoneration." 126 S.Ct. at 2086. A retrial could result in another verdict of guilt of first-degree murder and another death sentence, which could then be upheld by this Court. Nonetheless, a juror evaluating the newly discovered evidence in tandem with the evidence at trial and the previous postconviction proceedings would probably have reasonable doubt of Hildwin's guilt of the murder in this case. Thus, applying the standard of "probable acquittal" that governs newly discovered evidence claims, I would reverse the trial court order denying the motion for postconviction relief. I would grant Hildwin a new trial free of the serology evidence that we now know misled the jury and yielded a conviction that we can no longer confidently rely upon as the basis for a sentence of death.
ANSTEAD and QUINCE, JJ., concur.
NOTES
[1] The trial court found the following aggravating factors in imposing the sentence of death: (1) Hildwin committed the murder for pecuniary gain; (2) the murder was especially heinous, atrocious and cruel (HAC); (3) Hildwin had previously been convicted of prior violent felonies; and (4) he was under a sentence of imprisonment at the time of the murder. The trial court also found two statutory mitigators, both of which it accorded some weight: (1) Hildwin was under the influence of an extreme mental or emotional disturbance at the time of the murder; and (2) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired. Finally, the trial court found five nonstatutory mitigators, all of which it also accorded some weight: (1) Hildwin had a history of childhood abuse, including sexual abuse by his father; (2) Hildwin had a history of drug or substance abuse; (3) he had organic brain damage; (4) he had the ability to do well in a structured environment like prison; and (5) his type of mental illness was readily treatable in a prison setting.
[2] We recognize that in our opinion at 531 So.2d 124, 128, this Court stated, concerning a penalty-phase issue, "the evidence points convincingly to the conclusion that the appellant abducted, raped, and slowly killed his victim." We have since reversed that penalty phase, and Hildwin was provided a new penalty phase, 654 So.2d at 111, at which Hildwin was again sentenced to death. The sentence imposed at the second penalty phase was affirmed at 727 So.2d 193. In respect to the statements in our opinion at 531 So.2d at 124 concerning rape, we have reread the parties' briefs and listened to the tape-recordings of the oral argument which led to this Court's opinion. In the briefs, neither the State nor Hildwin stated that the victim had been raped or sexually assaulted. There was no mention of rape or sexual assault in oral argument. Nor was there any mention of rape or sexual assault in Hildwin's petition for rehearing. We conclude from the record that the trial court's conclusion that "[t]his matter was never prosecuted as a rape case," is correct.
[3] Frye v. United States, 293 F. 1013 (D.C.Cir. 1923).
[4] The serology evidence, combined with the other evidence against Hildwin, may also have led this Court in Hildwin's postconviction appeal to characterize the evidence of his guilt as "overwhelming." Hildwin v. Dugger, 654 So.2d 107, 109 (Fla.1995).
[5] The State did not present the serology evidence in Hildwin's resentencing, but nevertheless the jury asked during deliberations whether Cox had been raped.