CANADY, J.,
dissenting.
I dissent from the majority’s decision to vacate Paul Christopher Hildwin’s conviction for first-degree murder and sentence of death. Hildwin’s motion for postcon-viction relief is based on newly discovered evidence from DNA testing of a pair of women’s underwear and a white washcloth found in the victim’s car. Newly discovered evidence justifies setting aside a conviction only when that evidence— when reviewed in the full context of other admissible evidence — is “of such nature that it would probably produce an acquittal on retrial.” Jones v. State (Jones I), 591 So.2d 911, 915 (Fla.1991). Hildwin falls far short of meeting that standard.
The majority concludes that because “the State prosecuted the case based on a false theory of scientific evidence that was woven throughout its presentation of evidence and argument” and the DNA test results would support Hildwin’s defense, Hildwin is entitled to a new trial. Majority op. at 1180-81. The majority’s line of analysis — based on its conclusion that “a significant pillar of the State’s case, as presented to the jury, has collapsed” due to the newly discovered evidence, majority op. at 1181 — misses the mark. The question is not whether the serology evidence — now revealed to be erroneous by the DNA evidence — could have affected the guilt phase trial proceedings. Instead, the question is whether the DNA evidence, along with other admissible evidence, would be likely to “produce an acquittal on retrial.” Jones I, 591 So.2d at 915 (emphasis added).
On retrial, the DNA evidence would be of little consequence. When the totality of the evidence is considered, the postconviction court did not err in concluding that the newly discovered forensic evidence neither “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability,” Jones v. State (Jones II), 709 So.2d 512, 526 (Fla.1998) (quoting Jones v. State, 678 So.2d 809, 315 (Fla.1996)), nor would it “probably yield a less severe sentence,” Henyard v. State, 992 So.2d 120, 125 (Fla.2008) (citing Jones I, 591 So.2d at 916).
First, the new DNA evidence would have little or no probative value at a retrial in establishing that William Haverty, rather than Hildwin, committed the murder. The State established that Haverty and the victim had been dating for a few *1194 months and lived together. Given the co-habitating couple’s romantic relationship, the fact that DNA consistent with Haverty*s DNA was extracted from the semen found on the underwear that the victim was likely wearing on the day of her murder and the saliva found on a washcloth in the couple’s laundry tends only to establish that Haverty recently had sex with the victim and, at some point, used the washcloth. The presence of Havert/s DNA does not tend to prove that he murdered the victim. It would not give the jury any reason to conclude that Haverty was the person who removed the victim’s clothes, strangled her, and placed her body in the trunk of her car.
Second, the elimination of the erroneous serology evidence does not significantly weaken the case against Hildwin on retrial. Contrary to the majority’s claim, the now discredited nonsecretor evidence was not “a significant pillar of the State’s case.” Majority op. at 1181. This Court previously unequivocally rejected the view that “the serology evidence ... was a ‘scientific building block’ upon which the State’s entire case was built.” Hildwin v. State, 951 So.2d 784, 790 (Fla.2006). The nonsecretor evidence was only a small portion of the overwhelming evidence — detailed below — that linked Hildwin to the crime and demonstrated his lack of credibility.
As part of its guilt phase case, the State presented evidence establishing that Hild-win had the opportunity to attack the victim on the morning of September 9, 1985. Haverty testified that the vietim left their shared home at around 8:30 or 9 a.m. that morning to do laundry and to deposit a check. The State then called the two women who, the night before, went to a drive-in movie with Hildwin and became stranded with him along U.S. Highway 19 when his car ran out of gas. These witnesses explained that because the threesome had no money, they decided to spend the night in Hildwin’s car. The witnesses further explained that while Hildwin was in the car with his friends around dawn, Hildwin left the car sometime before 9 a.m. and did not return until after 10 a.m.
Helen Jean Lucash, who was Hildwin’s girlfriend in September 1985, testified that when she awoke around 9 a.m. on September 9, 1985, Hildwin was not in the car. She stated that Hildwin returned around 9:30 or 10 a.m. Similarly, Cynthia Wriston, a friend of Lucash and Hildwin, testified that when she first awoke just after daylight, Hildwin was in the car but that when she awoke again around 10 a.m., Hildwin was gone. Wriston explained that Hildwin returned to the car about twenty or thirty minutes after 10 a.m. and that when he returned, Hildwin walked to the Lone Star Bar to ask the owner to take him to get gas.
The evidence also established that when Hildwin returned to the car, he had cash. Lucash testified that while Hildwin had no money when they went to sleep, he had money for sodas and gas when he returned. Charles Schelawske, the owner of the Lone Star Bar, testified that sometime before the bar opened at 11:30 a.m., he drove Hildwin to a nearby convenience store to buy gas. A register tape from the store established that Hildwin bought two dollars’ worth of gas at 10:44 a.m., and Donna Ann Lucier, who was working at the convenience store that morning, testified that Hildwin paid for the gas with two one-dollar bills, not with loose change as Hildwin had claimed.
The amount of time that Hildwin was away from his friends was sufficient for him to have committed the crime. Detective Ralph Eugene Decker of the Hernan-do County Sheriffs Office testified that he and another officer drove from the Lone Star Bar to the pine forest where the *1195 victim’s shoes were found, approximately six-tenths of a mile north of Centralia Road in Brooksville, Florida. That drive took ten minutes. Detective Decker, dressed in plain clothes, then walked to Hildwin’s home, stayed at Hildwin’s home for five minutes, and began walking back to the Lone Star Bar. Despite there being only light traffic, Detective Decker was offered a ride by a passing motorist, which he accepted. This portion of the trip took only twenty-two minutes.
In contrast to Hildwin’s proximity to the crime scene on the morning of September 9, 1985, the State presented evidence that Haverty was at home that morning. Hav-erty testified that he and the victim moved into their home on Friday, August 30, 1985, and that a little over a week later, on September 9, 1985, his landlord’s brother arrived to mow the lawn. Haverty stated that the man began mowing between 8 a.m. and 9:30 a.m. and finished around 1 or 2 p.m. The State also called George James Weeks, who testified that he began mowing the lawn of his sister’s rental property on the Thursday or Friday before new tenants were scheduled to move in but did not finish the lawn because his mower blade was dull. When asked when he returned, Weeks answered, “immediately after the weekend, about Monday or Tuesday,” which would have been September 2 or September 3, 1985 — not September 9, 1985. But when again asked when he returned and if it was “immediately after the weekend [that] they had moved in,” Weeks equivocated, stating: “I believe it was, yes, sir.” Despite his uncertainty about the date, Weeks’ testimony was consistent with Haverty’s testimony on other details. Weeks stated that he began mowing at approximately 9 a.m. and did not finish until after noon. Weeks also testified that he was greeted by Haverty when he first arrived and that he did not see Haverty’s vehicle leave the property that morning.
Next, the State presented evidence rebutting Hildwin’s implausible testimony about his encounter with the victim on the morning of September 9, 1985. At trial, Hildwin testified that he was offered a ride by his “friend” Haverty and Haverty’s girlfriend. According to Hildwin, as the threesome drove toward Hildwin’s home, the couple began to argue, and when the victim had difficulty driving her car on a sand-paved road, they stopped. Hildwin explained that once stopped, the couple’s argument escalated and Haverty began to choke the victim. Hildwin then walked away, leaving the victim with Haverty and taking her radio and her checkbook, in which he later discovered two rings.
In addition to being inherently implausible, Hildwin’s testimony that Haverty choked his girlfriend and then allowed the only witness to the crime to casually walk away — carrying the victim’s radio — was inconsistent with Hildwin’s prior statements and the physical evidence presented at trial. In his pretrial statements given to law enforcement officers, Hildwin first claimed that either the victim was alone in the car or with one of Hildwin’s former coworkers when she stopped to give Hild-win a ride. After the coworker was discovered to have an alibi, Hildwin changed his statement and informed law enforcement officers that the victim’s boyfriend was present when the victim stopped to give Hildwin a ride. According to Hild-win, the boyfriend who choked the victim had a tattoo of a cross on his back. In contrast to his trial testimony identifying Haverty as a “friend,” when asked during a pretrial statement if the victim’s boyfriend was Haverty, Hildwin answered: “I do not know Bill Haverty.” Also at trial, Hildwin was forced, over defense objection, to show the jury the tattoo on his *1196 back, which he admitted looked like a cross. Haverty, in turn, testified that he did not know Hildwin until Hildwin was accused of the victim’s murder, and Haverty demonstrated to the jury that he did not have a tattoo on his back.
The State also presented evidence challenging Hildwin’s trial testimony that he sat in the backseat of the car while Haverty and the victim occupied the front seats. Tony Woodall testified that at around noon on September 13,1985, he discovered a car stuck in the mud near a road that had been flooded by a recent hurricane. Woo-dall explained that in the backseat of the car he saw “bags of clothes and fishing equipment in the floorboard.” As the State asserted during closing arguments, these items left little room in the backseat for a passenger. The State also presented evidence that a hair — which like Hildwin’s hair was dark brown near the root but artificially bleached near the tip — was found in the driver’s seat of the victim’s car.
Additional forensic evidence implicated Hildwin and exculpated Haverty. The victim’s car and some of her possessions were found in locations that supported the State’s theory that Hildwin took the victim into a pine forest, strangled her, hid her body in the trunk, walked to his own home, and then hours later, used the victim’s car to drive to a bank. Specifically, in a pine forest about 300 feet from the Oregon Trail on the north side of Centraba Road, law enforcement officers discovered a piece of door molding, which was determined to be from the victim’s car; several National Enquirer magazines, which the victim was known to keep in her car; and a pair of sandals, identified as belonging to the victim. Near these items, a law enforcement officer observed indentations that appeared to be tire tracks. Given that there were pine needles stuck to the victim’s body but no pine trees near where the victim’s car was discovered, this pine forest was likely where the victim was strangled and placed in her trunk. And when a law enforcement officer walked a direct route between the items in the pine forest and Hildwin’s nearby home, he found a purse, which contained a torn bra and the victim’s Social Security card. The purse, which was partially covered with leaves, was only a quarter of a mile from Hildwin’s home.
In contrast, the location of these items did not support Hildwin’s testimony that Haverty attacked the victim. At trial, Hildwin did testify that the victim turned north off of Centraba Road and became stuck on a sand-paved side street. Hild-win’s testimony did not, however, explain the tire tracks in the pine forest or why a piece of door molding from the victim’s car and the other items were located 300 feet away from the closest road. In addition, Hildwin continued to deny stealing the victim’s purse, despite its proximity to his home.
The State also called two witnesses who testified about Hildwin cashing a check on the afternoon of the murder. Alisa Kiker, who was working as a teller that day, identified Hildwin as the man who cashed the check purportedly written by the victim. In order to cash the check, Hildwin presented his driver’s license and provided Kiker with a phone number and Social Security number. Kiker further explained that Hildwin pulled into the drive-in window between 12:30 p.m. and 1 p.m. and was driving a “brownish” Chevrolet with three taillights. When shown a photograph of the victim’s car, Kiker stated that the taillights were consistent with the ones on the car driven to the bank by Hildwin. Rebecca Harrington testified that between 12 p.m. and 1 p.m. on September 9, 1985, she was at the bank with her grandmother. *1197 Harrington explained that while waiting for her grandmother to make a mortgage payment and check her blood pressure on a machine in the bank lobby, Harrington looked out the window of the bank and could see a car at the drive-in teller. Harrington testified that she noticed that the car had a sunroof and identified Hildwin as the man that she saw driving. Hildwin’s car did not have a sunroof, but the victim’s car did. Moreover, the victim’s car was found stuck in the mud near Labrador Duck Road. The car appeared to have been driven north and east, as Hildwin would have driven to return home from the bank. Overall, this evidence established that Hildwin drove the victim’s then late-model, brown 1984 Chevrolet Cavalier — not his own blue 1974 Chevrolet Malibu — to the bank.
Finally, the State called a witness who testified that he heard Hildwin confess to committing a murder. Robert Worgess testified that in November 1985, he was housed in the same area of the Hernando County Jail as Hildwin. Worgess explained that after reading a book called “Maximum Security,” Hildwin stated, “They’re going to fry my ass.” In response to this comment, Worgess asked Hildwin if “he kill[ed] her,” and Hildwin answered: ‘Yes, I did.” Worgess stated that Hildwin then added: “I stabbed her first.” While the State primarily argued that Hildwin strangled the victim, Wor-gess’s testimony did not conflict with the physical evidence. The medical examiner who testified at Hildwin’s trial stated that the injuries to the victim were consistent with strangulation and that there was also a “superficial laceration or tearing-type” injury just below the victim’s neck, but he was not able to determine whether it was “a tearing or cutting-type of wound.”
For the reasons explained above, the newly discovered DNA evidence would not likely result in an acquittal. Nor would the newly discovered evidence have any effect on Hildwin’s sentence. As this Court explained in its decision regarding Hildwin’s initial motion for postconviction relief, the “secretor/non-secretor evidence was not presented at the resentencing” and the sentencing judge did not rely on any evidence of a sexual battery in finding the aggravating factors that: (1) the murder was committed for pecuniary gain; (2) the murder was especially heinous, atro-. cious, or cruel; (3) Hildwin had been previously convicted of a violent felony; and (4) Hildwin was under sentence of imprisonment at the time of the murder. Hildwin, 951 So.2d at 790. Because the now discredited evidence did not contribute to Hildwin’s original death sentence, Hildwin has not established that he would likely receive a life sentence on retrial.
In conclusion, I would affirm the post-conviction court’s order denying relief. The new DNA evidence does not create reasonable doubt about Hildwin’s culpability and would not probably result in a lesser sentence. There is no basis for vacating his conviction and sentence and ordering a new trial nearly thirty years after the crimes occurred. Therefore, I dissent.
POLSTON, C.J., concurs.