PER CURIAM.
Roy Clifton Swafford, a prisoner under sentence of death, appeals the circuit court’s denial of postconviction relief. He seeks to have his convictions for first-degree murder and sexual battery vacated after newly discovered evidence revealed that there was no seminal fluid found in the victim.[1] Specifically, as set forth in his motion for postconviction relief, Swafford alleged and subsequently proved that at the time of trial in 1985, the Florida Department of Law Enforcement (FDLE)
tested vaginal and anal swabs of the victim and got a positive result for acid phosphatase, a substance characteristically found in seminal fluid. Semen could not be conclusively identified because no spermatozoa were found. The State argued that this circumstantial evidence corroborated that Mr. Swafford had sexually assaulted and murdered the victim.... However, in 2005, FDLE’s testing indicates the opposite— that no acid phosphatase was found and no semen was identified.
The acid phosphatase (AP) evidence was the linchpin of the State’s case that a sexual battery occurred, especially because the victim was found fully clothed and the medical examiner relied on the now-discredited FDLE testing that AP was present in order to conclude that the victim was sexually battered.
Further, this newly discovered evidence also significantly impacts the first-degree murder conviction, since the State built its case on the sexual battery as the motive for the murder and then relied on a statement made by Swafford two months after the murder to demonstrate Swafford’s guilt. Without the evidence that a sexual battery occurred, all that remains linking Swafford to the murder are two lone pieces of evidence: (1) that Swafford was seen with a gun at the location where the murder weapon was later discovered; and (2) that Swafford may have been driving by the location in Daytona Beach where the victim was abducted on the day of the Daytona 500 race, at a time when thousands of visitors had traveled to Daytona Beach for the event. In addition, Swaf-ford’s jury never heard that there was another viable suspect, Michael Walsh, who matched the description of the murderer, who was also in the vicinity of the FINA station where the abduction occurred, who had a vehicle matching the description of the vehicle at the abduction site, who himself had possession of the same type of gun that turned out to be the murder weapon, who was seen in the same location where the police later recovered the murder weapon, and who had the opportunity to abduct and murder the victim.
In light of the evidence presented at trial, and considering the cumulative effect of all evidence that has been developed through Swafford’s postconviction proceedings, we conclude that the totality of the evidence is of “such nature that it would probably produce an acquittal on retrial” *763 because the newly discovered evidence “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.” Jones v. State (Jones II), 709 So.2d 512, 523, 526 (Fla.1998) (quoting Jones v. State (Jones I), 678 So.2d 809, 315 (Fla.1996)).
Accordingly, we reverse the circuit court’s denial of postconviction relief as to Swafford’s convictions for sexual battery and first-degree murder, vacate the respective convictions and sentences, including the sentence of death, and remand for a new trial. Further, it would appear on the record currently before us that there would be insufficient evidence for the charge of sexual battery to be presented to the jury, and on remand the trial court should consider whether a judgment of acquittal should be granted on the sexual battery charge.
FACTS AND PROCEDURAL HISTORY
Swafford was convicted of the 1982 sexual battery and first-degree murder of Brenda Rucker and was sentenced, respectively, to life imprisonment and death based on a theory of the case that the victim had been kidnapped, sexually battered, and then murdered. We previously recounted the evidence presented to the jury as follows:
The evidence showed that on the morning of Sunday, February 14, 1982, the victim was at work at the FINA gas station and store on the corner of U.S. Highway No. 1 and Granada Avenue in Ormond Beach, Florida. Two witnesses saw her there at 5:40 and 6:17 a.m. A third -witness, who said he arrived at the station at around 6:20, found no attendant on duty although the store was open and the lights were on. At 6:27 a.m., the police were called, and an officer arrived at the station a few minutes later.
On February 15, 1982, the victim’s body was found in a wooded area by a dirt road, about six miles from the FINA Station. She had been shot nine times, with two shots directly to the head. The cause of death was loss of blood from a shot to the chest. Based on trauma, lacerations, and seminal fluid in the victim’s body, the medical examiner concluded that she had been sexually battered. Holes in the victim’s clothing corresponding to the bullet wounds to her torso indicated that she was fully clothed when shot. The number of bullet wounds and the type of weapon used indicated that the killer had to stop and reload the gun at least once. Several bullets and fragments were recovered from the body.
Swafford and four companions drove from Nashville, Tennessee, to Daytona Beach, Florida, departing Nashville at about midnight on Friday, February 12 and arriving in Daytona Beach at about noon the next day. After setting up camp in a state park, Swafford and some others went out for the evening, arriving back at the campground at about midnight. Then, according to the testimony at trial, Swafford took the car and went out again, not to return until early Sunday morning.
State’s witness Patricia Atwell, a dancer at a bar called the Shingle Shack, testified that Swafford was there with his friends on Saturday night, that they left at around midnight, and that Swaf-ford returned alone at about 1:00 a.m. Sunday. When Atwell finished working at 3:00 a.m., she left the Shingle Shack with Swafford. They spent the rest of the night together at the home of Swaf-ford’s friend. At about 6:00 a.m., he returned her to the Shingle Shack and left, driving north on U.S. 1, a course that would have taken him by the FINA *764 station. In the light traffic conditions of early Sunday morning, the FINA station was about four minutes away from the Shingle Shack. According to Swafford’s travelling companions, he returned to the campsite around daybreak. The court took judicial notice of the fact that sunrise took place on the date in question at 7:04 a.m.
On Sunday Swafford and his friends attended an auto race in Daytona Beach. That evening they went back to the Shingle Shack, where one of the party got into a dispute with some other people over money he had paid in the expectation of receiving some drugs. Swafford displayed a gun and got the money back. The police were called, and Swafford deposited the gun in a trash can in one of the restrooms. The police seized the gun, and ballistics tests performed later conclusively established that Swafford’s gun was the gun used to kill the victim. The evidence also showed that Swafford had had the gun for some time. Although the gun was not tested until more than a year after the murder, after authorities received a tip concerning Swafford’s possible involvement, evidence established the chain of police custody and the identification of the gun.
The state also presented evidence that Swafford made statements from which an inference of his guilt of the crimes charged could be drawn. Ernest Johnson told of an incident that took place about two months after this murder. After meeting Swafford at an auto race track, Johnson accompanied him to his brother’s house. When leaving the brother’s house, Swafford suggested to Johnson that they “go get some women” or made a statement to that effect. Johnson testified as follows concerning what happened then:
Q. Okay. What happened then? What was said by the Defendant?
A. He just asked me if I wanted to go get some girl and I said yeah.
Q. And then what took place?
A. We got in — he asked me if I wanted to take my truck and I said no, so we went in his car.
All right. We went and got a six-pack of beer and started riding. And he said, do you want to get a girl, and I said yeah, where do you want to get one, or something like that. He said, I’ll get one.
So, as we was driving, I said, you know, where are you going to get her at. He said, I’ll get her. He said — he said, you won’t have to worry about nothing the way I’m going to get her, or he put it in that way. And he said — he said, we’ll get one and we’ll do anything we want to her. And he said, you won’t have to worry about it because we won’t get caught.
So, I said, how are you going to do that. And he said, we’ll do anything we want to and I’ll shoot her.
So, he said if — you know, he said that he’d get rid of her, he’d waste her, and he said, I’ll shoot her in the head.
I said, man, you’re crazy. He said, no, I’ll shoot her in the head twice and I’ll make damn good and sure that she’s, you know, she’s dead. He said, there won’t be no witnesses.
So, I asked him, I said, man, don’t — you know, don’t that bother you. And he said, it does for a while, you know, you just get used to it.
Johnson then told the jury that he and Swafford went to a department store parking lot late at night, that Swafford selected a victim, told Johnson to drive the car, directed him to a position beside *765 the targeted victim’s car, and drew a gun. Johnson at that point refused to participate further and demanded to be taken back to his truck.
The jury found Swafford guilty of first-degree murder and sexual battery and recommended a sentence of death. The trial court then sentenced Swafford to death for the first-degree murder.
Swafford v. State, 533 So.2d 270, 271-73 (Fla.1988). On direct appeal, this Court affirmed the convictions and sentences. Id. at 278.
In subsequent proceedings, including prior postconviction proceedings and extraordinary writ petitions, Swafford challenged his convictions and sentences, asserting that he was entitled to relief based on newly discovered evidence that demonstrated he did not commit the crimes, among other claims. . We denied Swaf-ford’s two petitions for a writ of habeas corpus, dismissed his petition for prohibition or mandamus relief, and affirmed the denial of his prior motions for postconviction relief. See, e.g., Swafford v. Dugger, 569 So.2d 1264 (Fla.1990) (denying the petition for writ of habeas corpus, affirming the trial court’s denial of his initial motion for postconviction relief, and denying his stay of execution); Swafford v. Singletary, 584 So.2d 5 (Fla.1991) (denying Swafford’s petition for writ of habeas corpus); Swafford v. State, 636 So.2d 1309 (Fla.1994) (affirming the trial court’s denial of his second motion for postconviction relief); Swafford v. State, 828 So.2d 966 (Fla.2002) (affirming the trial court’s denial of his third motion for postconviction relief).
In the current proceeding, Swafford filed a fourth motion for postconviction relief pursuant to Florida Rule of Criminal Procedure 3.851 and a motion for DNA testing pursuant to Florida Rule of Criminal Procedure 3.853. The postconviction court dismissed the motion for postconviction relief and denied the motion for DNA testing. Swafford appealed, and we reversed and remanded the DNA testing case for further proceedings. Swafford v. State, 871 So.2d 874 (Fla.2004) (No. SC03-931) (table decision). We also reversed the order dismissing the fourth motion for postconviction relief and remanded for further proceedings following the postconviction court’s ruling in the DNA testing case. Swafford v. State, 871 So.2d 874 (Fla.2006) (No. SC03-1153) (table decision).
On remand, the postconviction court held an evidentiary hearing, where the parties determined which pieces of evidence were to be submitted for DNA testing. Following that testing, the postcon-viction court issued an order, stating that it had complied with the directions from this Court on remand. Swafford appealed, seeking an additional evidentiary hearing on DNA testing and further DNA testing by an uncertified laboratory. We affirmed the postconviction court’s order denying these additional requests, but specified that “[tjhis denial is without prejudice to Swafford presenting DNA issues, including any issues concerning possible contamination of DNA samples, in further proceedings under rule 3.851” and granted Swaf-ford sixty days “to amend his [pending fourth] rule 3.851 motion to present any DNA issues.” Swafford v. State, 946 So.2d 1060, 1061 (Fla.2006).
Swafford accordingly filed an amended fourth motion for postconviction relief, arguing in pertinent part of his newly discovered evidence claim that,
[a]t the time of trial in 1985, FDLE tested vaginal and anal swabs of the victim and got a positive result for acid phosphatase, a substance characteristically found in seminal fluid. Semen could not be conclusively identified because no spermatozoa were found. The State argued that this circumstantial ev *766 idence corroborated that Mr. Swafford had sexually assaulted and murdered the victim.
... However, in 2005, FDLE’s testing indicates the opposite — that no acid phosphatase was found and no semen was identified. This evidence would have been invaluable at the time of trial in that it directly rebutted the State’s case and did not show that Mr. Swafford sexually assaulted or murdered the victim.
After holding an evidentiary hearing on this claim-, the postconviction court ruled that the testing was newly discovered evidence:
At the jury trial in 1985 Keith Paul testifying for the state told the jury while running chemical tests for semen or seminal fluid that he received a positive test for acid phosphatase (hereafter referred to as APT), which he told the jury was commonly found in seminal fluid. He later told the jury that a positive test would be a very strong indication that semen was present.
Also at the jury trial in 1985 the Medical Examiner, Dr. Arthur Botting, told the jury that based on the positive APT that it established there was seminal fluid, though he further told the jury that the test did not find any actual sperm cells.
At the jury trial in 1985 the state prosecutor in his closing argument briefly told the jury there was evidence of semen.
At this DNA evidentiary hearing, the defense witness, Shawn Johnson, testified that approximately twenty (20) years later in 2004, while with the Florida Department of Law Enforcement he re-tested the vaginal and anal swabs that had been preserved and the APT was negative indicating the lack of seminal fluid.
The other defense witness at this hearing, Alan Keel, testified that with a negative APT, then that would indicate the lack of seminal fluid and the state witnesses at the jury trial in 1985 should have conducted further tests to confirm or refute the presence of seminal fluid.
The standard for newly discovered evidence requires first, that the asserted facts must have been unknown by the trial court, by the parties, or by the attorneys, at the time of trial, and it must appear that the Defendant or his trial counsel could not have known then by the use of due diligence, and, if so, secondly, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.
This Court finds that the defense has met the first prong of the standard for newly discovered evidence and finds that the negative APT results from the retesting of the swabs in 2004 qualifies as such.
However, the postconviction court concluded that there was a “strong circumstantial evidence case against the Defendant,” relying on the State’s showing that Swafford “had the opportunity to commit the kidnapping and murder of the victim,” that Swafford “had in his possession the firearm that fired the nine bullets killing the victim,” and on statements Swafford made to a friend two months after the murder in which he confided “how they could kidnap, rape, and murder a female by shooting her.”
Swafford now appeals, raising three claims: (1) the postconviction court erred in how it evaluated the DNA claim because the court failed to consider the cumulative effect of the false AP testimony to the jury along with the evidence that DNA testing showed a pubic hair in the victim’s underwear that did not belong to the victim or to *767 Swafford, as well as the cumulative effect of the withheld Brady[2] evidence pertaining to a different suspect; (2) the postconviction court erred by failing to hold any evidentiary hearing on issues pertaining to contamination and authenticity of the DNA testing done by FDLE or provide Swaf-ford with the opportunity to prove his actual innocence based on other newly discovered DNA evidence that exonerates him; and (3) the postconviction court erred in failing to allow Swafford to select a DNA defense expert of his own choosing to conduct DNA testing on biological material from which FDLE could not obtain conclusive results.
For the reasons more fully explained below, we reverse the denial of postconviction relief as to Swafford’s conviction for sexual battery and sentence of life imprisonment and also reverse the denial of post-conviction relief as to Swafford’s conviction for first-degree murder and sentence of death. Because we grant relief as to the first claim raised by Swafford, we do not address Swafford’s second and third claims.
ANALYSIS
Swafford argues that the post-conviction court’s order denying relief is contrary to the law and unsupported by competent, substantial evidence. As we have explained:
To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements. First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So.2d 512, 521 (Fla.1998) (Jones II). Newly discovered evidence satisfies the second prong of the Jones II test if it “weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.” Jones II, 709 So.2d at 526 (quoting Jones v. State, 678 So.2d 309, 315 (Fla.1996)). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence. See Jones v. State, 591 So.2d 911, 915 (Fla.1991) (Jones I).
In determining whether the evidence compels a new trial, the postconviction court must “consider all newly discovered evidence which would be admissible” and must “evaluate the weight of both the newly discovered evidence and the evidence which was introduced at the trial.” Id. at 916. This determination includes
whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether this evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.
Jones II, 709 So.2d at 521 (citations omitted).
When ... the postconviction court rules on a newly discovered evidence claim after an evidentiary hearing, this Court “review[s] the trial court’s findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence.” Green v. State, 975 So.2d 1090, 1100 (Fla.2008). In addition, “we review *768 the trial court’s application of the law to the facts de novo.” Id.
Marek v. State, 14 So.3d 985, 990 (Fla.2009).
As to the first prong of the newly discovered evidence test, the postconviction court found that the negative AP results from the retesting of the swabs qualifies as newly discovered evidence. We hold that the postconviction court’s factual findings are supported by competent, substantial evidence and that it correctly applied the law to those facts in ruling that Swafford satisfied the first prong. See Jones II, 709 So.2d at 521 (“First, in order to be considered newly discovered, the evidence ‘must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence.’ ” (quoting Torres-Arboleda v. Dugger, 636 So.2d 1321, 1324-25 (Fla.1994))).
The second prong of the newly discovered evidence test requires that “the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial.” Jones II, 709 So.2d at 521 (citing Jones I, 591 So.2d at 911, 915). Swafford asserts that the newly discovered evidence impacts both his conviction for sexual battery and his conviction for first-degree murder. We address the impact of the newly discovered evidence as to each conviction in turn.
I. Sexual Battery
As relevant to Swafford’s sexual battery conviction, the postconviction court found that, “even if testimony of semen being present is taken out of the equation that would still have left testimony that there [were] physical injuries to the victim consistent with sexual assault.” While remaining evidence existed that possibly could have supported a conviction for sexual battery, we conclude that the newly discovered AP evidence so significantly weakened the case against Swafford that it gives rise to a reasonable doubt as to his culpability for the sexual battery.
At trial, the medical examiner, Dr, Arthur Botting, testified for the State on direct examination that the victim was discovered fully clothed with nine bullet injuries to her body. Her clothing was not damaged, except for blood stains and the multiple bullet holes. Dr. Botting further discussed the location of the bullet wounds, including one that caused a hole to her underwear and her clothing to be bloodstained. When Dr. Botting was asked whether the victim had been sexually molested, he asserted that the victim’s vagina did not show any evidence of abrasions, lacerations, or trauma. However, because the victim’s “rectum [had] multiple superficial lacerations, and the skin around the anus was covered with blood,” Dr. Botting made swabs of the vaginal and anal orifices and the oral cavity in order to establish whether the victim had been sexually molested. When asked about the importance of the results of the swabs, Dr. Botting replied, “I would rely on the analysis of these swabs to make that determination [of a sexual battery].” The AP results, which were obtained by testing the swabs, were therefore key to this determination. When asked if he had in fact determined if the victim had been sexually molested, Dr. Botting responded affirmatively, explaining that the presence of AP was important to his conclusion because AP is a known constituent of seminal fluid.
On cross-examination, Dr. Botting reaffirmed his prior statements that, based on the victim’s clothing, she had been shot while she was fully dressed and the condition of the clothing did not give any indication that it was taken off forcefully. As to the AP test results, he stated that the presence of AP in both the anus and vagi *769 na “absolutely establishes the presence of a male organ” in those areas, “[n]ot only the male organ there, but seminal fluid being ejaculated into the orifices.” When asked if he was certain, he replied, “[y]es, sir, because the [AP] is a component of seminal fluid.”
FDLE analyst Keith Paul also testified for the State at trial, stating on direct examination that he obtained positive AP test results on the swabs and that AP “is commonly found in seminal fluid.” Upon microscopic examination of the swabs, however, Paul could not find any sperm cells, so he “could not conclusively say that ... these items contained semen.” Nevertheless, based on his examination of the swabs and the sensitivity of the AP test, Paul testified that the positive AP test results were “a very strong indication that semen was present.” He answered affirmatively when asked on cross-examination whether the presence of AP is “positive proof that there has been a male organ at that place.” When asked further, “given a vaginal area and an anal area and [the presence of AP in both], there would have to have been a male organ at one or the other[?],” he responded, “Correct.”
The positive AP test results were therefore the linchpin of the sexual battery conviction, particularly in light of the fact that other trial evidence suggested that Swaf-ford did not commit a sexual battery on the victim. First, the victim’s clothing did not provide any support for a sexual battery, as she was found fully clothed, and other than the bullet holes,' her clothing was undamaged. Second, Swafford had been involved in a three-hour adult sexual relationship with a woman between the hours of 3 a.m. and 6 a.m., shortly before the victim was kidnapped at around 6:20 a.m. Finally, Swafford had a very limited time in which to kidnap the victim, take her to a different location and sexually batter her, redress her, kill her, and then move the body to the location where the body was found. Specifically, the victim was seen at the FINA station from where she was kidnapped at around 6:18 a.m., and trial evidence indicated that Swafford returned to his campsite around sunrise, which occurred at 7:04 a.m. The window of time for Swafford to have committed this crime in the manner argued by the State was very short.
In closing argument during the guilt phase of the trial, the prosecutor attempted to rebut these problems with the evidence by relying on the AP test results, arguing that “[i]t is [Dr. Botting’s] professional expert opinion that that girl was raped anally by an individual,” and that “[t]here was evidence of semen — not semen, but a component of semen ... there was evidence there of semen which confirmed Dr. Botting’s opinion that that girl had been sexually abused and force enough to cause abrasions to her anus.” The prosecutor rhetorically asked the jury, “How long does it take for a person with a gun to the head of a female to order her to take off her pants and to anally abuse her and for her to put her pants back on and to be shot in a desolate area? Who knows? That is something for you, the jury, to decide when you’re deliberating.” The prosecutor concluded that “rape is not a crime of passion, rape is a crime of violence. I think everyone will tell you that. It’s not done for a sexual gratification, it’s done for violence, not a relationship to satisfy your sexual appetite. If it was, would you anally rape a woman?”
Based on a review of the trial evidence, it is clear that the positive AP test results were the basis for the sexual battery conviction. In fact, since Dr. Botting testified that it was his reliance on the swab testing that permitted him to make the determination that the victim had been sexually bat *770 tered, and since his testimony, along with the positive AP test results, was the only evidence establishing the sexual battery, based on the record before the jury, without the AP test results, there was insufficient evidence that a sexual battery occurred at all in this case.
During postconviction proceedings, Swafford presented evidence that established all of the swabs upon retesting tested negative for the presence of AP, despite the fact that this is an “exceedingly stable enzyme.” Moreover, contrary to the testimony presented to the jury, three experts testified during postconviction proceedings that the mere presence of AP does not establish the presence of a male organ because AP is found in other bodily fluids, not just semen. Charles Keel testified that, while AP is present at high concentrations in semen, AP is also present in lower concentrations in female bodily fluids, including vaginal fluid and in the rectum. He further stated that the AP test is only a presumptive test, and if a positive AP result is obtained, one would need to perform a quantitative AP assay in order to determine whether the concentration of AP was consistent with semen— something that was not performed in Swafford’s case. In addition, Keel noted that the likelihood of the presence of semen was negated based on two other tests also performed in 1982: a test for choline[3] returned negative results, which was contra-indicative if there was enough semen present to provide a positive AP result, and no sperm was found in the same sample that tested positive for AP, which would be “very rare” unless Swafford was aspermic.[4] In fact, Keel testified that the presence of sperm, which was not found in this case, is the most sensitive and specific test for semen, in light of the positive AP test results.
Shawn Johnson, who retested the swabs in 2004 at the FDLE crime laboratory, testified in a similar fashion. Specifically, he stated that a spot test for AP is insufficient to conclusively demonstrate the presence of semen, and that if AP is found and was from semen, he would expect to find sperm. If he obtained a positive AP result and a negative sperm result, Johnson testified that he would need to conduct a prostate specific antigen test in order to confirm the presence of semen.
Paul, who conducted the initial 1982 testing, also testified during the postcon-viction proceedings. He recognized that the AP tests he performed were only presumptive tests and he did not perform the quantitative tests to confirm whether semen was present. He testified that although during the trial he had agreed that “given a vaginal area and an anal area and [the presence of AP in both], there would have to have been a male organ at one or the other,” he did not mean to say a male organ was either at the anus or the vagina and that he must have misunderstood the question.
In sum, evidence from the postconviction proceedings established the following: new testing of the same swabs showed opposite results from the initial testing; no explanation for this disparity was established; two other tests during the initial examination showed that it was very unlikely that the initial positive AP test results indicated semen based on the absence of choline and sperm; and the trial testimony that stated that a positive AP test result alone was *771 sufficient to establish semen was scientifically inaccurate..
The dissent attacks the new testing by stating that “the vaginal and anal swabs collected in 1982 could not be reliably retested for acid phosphatase in 2004.” Dissenting op. at 780. However, the postcon-viction court did not find that the new testing was unreliable. In fact, no testimony was presented to show that bacteria was present on the swabs that would have prevented accurate readings.
To the extent that this was a possibility, the record provides no support that both the anal and the vaginal swabs were stored improperly. The only possible issue may have been with the vaginal swabs prior to the initial testing. Specifically, when Paul received the swabs and conducted the initial tests, he noted that the vaginal swabs were damp, but the anal swabs were dry and were not damp. Paul testified that he knew the proper way to store swabs and that they should not be stored in a moist condition. Johnson received all of the swabs for retesting, noting that the swabs were stored in a plastic vial. While he testified that being encased in plastic would be a problem if the swabs were stored in a moist condition, he also recognized the swabs could be safely stored in plastic if they were dried first. Johnson had no indication that Paul had stored the swabs incorrectly after the initial testing. The swabs appeared normal and were not wet. Therefore, the excerpts from Johnson’s testimony in the dissent do not support a finding that the new testing was unreliable.
In addition, while the dissent points out that the jury was informed that no sperm was found, the testimony presented at trial did not inform the jury as to the significance of this fact. In fact, Paul’s trial testimony minimized the significance of this evidence as follows: “In the field today, there is some problem because there are so many people that have vasectomies or just have no sperm counts....” This trial testimony was completely contrary to the new postconviction testimony.
Moreover, the dissent also relies on the physical evidence of injury to the victim, including the presence of blood, to support its assertion that there was evidence presented to the jury that was consistent with a sexual battery. However, the trial record itself is not clear as to the source of the blood. Dr. Botting testified that the victim had been shot in that area, resulting in a bullet hole to her underwear and causing her clothing to become bloody. In addition, the jury was presented with a sketch as to the location of all of the injuries that the victim suffered, including a bullet hole to-her buttock.
Dr. Botting also testified that he noted superficial lacerations to the rectum during his physical examination but did not provide an explanation for the lacerations. Dr. Botting never stated that he could determine whether a sexual battery occurred in the absence of the AP testing. To the contrary, when he was directly asked whether his physical examination of that portion of the victim alone permitted him to form an opinion within the bounds of reasonable medical certainty as to whether the victim had been sexually battered, he replied that swabs were made based on his examination and he would “rely on the analysis of th[ose] swabs to make that determination” of whether a sexual battery occurred. He further testified that he had indeed made a determination regarding sexual battery because AP was identified in the swabs from both the vagina and the anus. Therefore, the dissent’s assertion that the sexual battery is the only explanation for the superficial lacerations in the area of the anus is absolutely unsupported by the record.
*772 In other words, during the trial, the jury was presented with evidence that testing definitively showed the presence of AP and that the presence of AP conclusively established that a male organ was present and semen was ejaculated into the victim. Dr. Botting testified that the presence of AP established that the victim was sexually battered. On direct appeal, this Court likewise accepted that the experts had established seminal fluid was found in the victim’s body. See Swafford, 533 So.2d at 272. Undisputed new evidence now shows that the results of the AP test are negative and even if they had been positive, this evidence is insufficient to confirm the presence of seminial fluid or the presence of a male organ. Without the testimony pertaining to the AP test results, Dr. Bot-ting’s testimony cannot support the occurrence of a sexual battery because he did not testify whether he could conclude the victim had been sexually battered based solely upon the lacerations. Moreover, the exhibits presented to the jury provide no insight into the nature of the wounds supporting the sexual battery because the injuries are not depicted.
Thus, the postconviction court erred in its conclusion that the newly discovered negative AP test results were not of such a nature that they would probably have produced an acquittal. Accordingly, we vacate Swafford’s conviction for sexual battery.
II. First-Degree Murder
Swafford next contends that this newly discovered evidence also impacts his first-degree murder conyiction. We agree.
The State’s entire case was built around a theory that Swafford’s motive in abducting and murdering the victim was to engage in a sexual battery against her. The AP test results seriously undercut this theory. Moreover, if there is no sexual battery, then this impacts the admissibility of the inflammatory comment attributed to Swafford, and testified to by Ernest Johnson, that Swafford stated that he could get a girl for them, they could do anything they wanted with her, and Swafford would then shoot her. Specifically, the trial court permitted the State to introduce Johnson’s statement after the State asserted that this was admissible as similar fact Williams[5] rule evidence and was admissible as a statement against interest because the statement could be used to support that Swafford recognized he had previously abducted a girl, performed any sexual act that he desired, and then shot her.
On direct appeal, this Court viewed the statements “in the context of [Swafford] having just said that they could get a girl, do anything they wanted to with her and shoot her twice in the head so there wouldn’t be any witnesses” and recognized that this evidence was relevant because it “tended to prove that he had committed just such a crime in Daytona Beach only two months before.” Swafford, 533 So.2d at 273-74 (emphasis added). Thus, if the evidence no longer supports that a sexual battery occurred, this completely changes the predicate for the admission of the statements, making relevancy dubious and prejudice greater. Without the predicate crime of sexual battery, Swafford’s statements allegedly made to Johnson would be inadmissible.
Further, and critical to the analysis, if there was no sexual battery, then the State’s entire theory of the case has been eliminated because the State’s circumstantial case was premised on Swafford’s motive having been the sexual battery. No witness, DNA, or fingerprints link Swaf-ford to the victim or the murder weapon. The newly discovered forensic evidence re *773 garding the alleged sexual battery changes the very character of the case and affects the admissibility of evidence that was heard by the jury. Only two primary pieces of evidence remain: (1) that Swaf-ford was seen with a gun at the location where the murder weapon was later discovered; and (2) that Swafford may have been driving by the location in Daytona Beach where the victim was abducted on the day of the Daytona 500, at a time when thousands of visitors had traveled to Day-tona Beach for the event. We review the remaining evidence and its impact on the trier of fact to determine whether the new forensic evidence weakens the case against Swafford so as to give rise to a reasonable doubt as to his culpability.

A. Remaining Evidence

With this backdrop in mind, we examine the remaining evidence upon which the conviction for first-degree murder was based: (1) the gun and (2) Swafford’s proximity to the murder scene.
(1) THE GUN: Unquestionably, the primary piece of evidence upon which the conviction now rests pertains to whether Swafford possessed the murder weapon. As to the murder weapon, a complete review of the trial record shows contradictory evidence to support that the gun the police seized, and later determined to be the murder weapon, was the gun that belonged to Swafford. In fact, the evidence introduced at trial could support the opposite conclusion: that the police did not seize the weapon belonging to Swafford.
There is no dispute that Swafford was at the Shingle Shack, a topless bar, both on the early morning hours of February 14, 1982, and later with friends on the evening of February 14. The trial evidence also established that when Swafford returned on the evening of February 14, he possessed a gun, which he displayed to others when he was attempting to help his friend recover his money during a confrontation outside of the bar. However, the evidence does not establish that the gun that Swaf-ford displayed at the Shingle Shack was the murder weapon.
Specifically, on the evening of February 18, 1982, Swafford and his friends visited the Shingle Shack and, after dropping his friends off at' their campsite at Tomoka State Park, Swafford returned to the Shingle Shack to meet one of the performers, who agreed to see him after her shift ended at 3 a.m. Swafford picked up his date, took her to a friend’s home where the couple had consensual sexual relations, and then dropped her back at the Shingle Shack, returning to the campsite at sunrise on February 14. That day, after attending the Daytona 500 race, Swafford and his friends again visited the Shingle Shack. While they were there, one of Swafford’s friends attempted to buy some drugs from three people in a car outside of the bar while Swafford was with him. When the men in the car refused to give Swafford’s friend the drugs or return his money, Swafford displayed a gun so his friend could recover his money. The men in the car drove off and reported to the police that they were the victims of an armed robbery at the Shingle Shack.
The police responded, and during their investigation, they obtained a gun from a bouncer, Clark Griswold, who relayed that a man had placed the gun in the trash can of the men’s restroom. Notably, a review of the evidence fails to show that the gun obtained by the police — later found to be the murder weapon — belonged to Swaf-ford. In fact, the trial record evidence could support the opposite conclusion— that this was not the gun that Swafford possessed.
Specifically, Karen Sarniak testified at trial that she had witnessed Swafford dispose of his gun, but stated that this had *774 occurred in a different location from where the murder weapon was found. Sarniak was working at the Shingle Shack on February 14 and saw Swafford near the bar. According to her testimony, when she asked Swafford if he needed anything, he inquired whether there was a rear exit from the bar. Since the bar padlocked the back door, they went into the ladies’ restroom together. Sarniak testified that she first peeked into the ladies’ restroom to make sure it was not occupied, and then Swafford asked her to stay by the door to make sure no one entered. At that point, Swafford pulled out a gun, and stashed it in the ladies’ restroom trash can. Sarniak testified that she personally observed Swafford place the gun in the ladies’ restroom trash can. She then left the restroom and went back to the bar and was not in the restroom when the gun was retrieved. However, she later saw that a law enforcement officer had a gun at the Shingle Shack and thought the law enforcement officer went into the ladies’ restroom to retrieve the gun, which she assumed had been found in the ladies’ restroom trash can.
Critically, however, the gun that law enforcement obtained did not come from the ladies’ restroom, but instead came from the men’s restroom. None of the responding law enforcement officers testified that they had obtained the gun by checking the restrooms at the club. Instead, Officer William Vaughn testified that he received the gun, which was later determined to be the murder weapon, while he was outside of the club from Clark Griswold, the bouncer at the Shingle Shack on February 14 when the incident occurred. Griswold testified that he saw one of the waitresses trying to let a man out of a side door. He asked the man to accompany him outside to speak with law enforcement, which had responded to the armed robbery. On the way outside, the man asked to use the restroom, so Gris-wold accompanied him to the men’s restroom. Griswold did not see the man with a gun, but assumed the man must have had a gun because law enforcement was looking for a man with a gun and Griswold thought the man would dispose of the gun in the restroom. However, Griswold did not enter the restroom with the man and did not see the man place a gun in the trash can. After the man left the men’s restroom, Griswold accompanied the man outside and then went to the men’s restroom and found a gun in the bottom of a trash can. He picked up the gun with a paper towel and handed it to a law enforcement officer. Griswold later identified the State’s exhibit at trial as the gun he found that night in the men’s restroom, noting that he used to own one just like it, but he lost it.
Griswold never identified the person he turned over to law enforcement officers as Swafford. He also asserted that the bar was about half full at the time, with approximately 125 people present, although he was not completely sure as to that detail. The law enforcement officers who responded to the Shingle Shack likewise testified, asserting that only one gun was recovered from the scene and that they obtained this gun from Griswold.
While Griswold did find a gun in the men’s restroom, no testimony at trial established when the gun was placed in that location or who placed the gun there. Moreover, if this Court attempted to reconcile Sarniak’s and Griswold’s differing testimony, Sarniak had no recollection of Griswold being a part of the incident, and Griswold similarly had no recollection of Sarniak being a part of the incident that he observed.
Although the gun that police recovered from the men’s restroom that night was *775 later determined to be the murder weapon, the gun in question was very popular: a hammerless Smith and Wesson .38. As defense counsel pointed out, at the time of the manufacture date of that weapon, Smith and Wesson had made over 700,000 guns of that same model. In fact, Gris-wold himself testified that he used to have that same gun until he lost it. In sum, no physical evidence exists that ties Swafford to the murder weapon. Instead, a reasonable inference from the record is that Swafford’s weapon was never recovered.
(2) PROXIMITY TO THE MURDER SCENE: The second piece of evidence relied upon at trial was Swafford’s proximity to the murder scene. The record demonstrates that Swafford could have been driving by the' location where the victim was abducted in the early morning hours on the day of the Daytona 500 because he may have been driving down U.S. 1, which is a heavily trafficked road in the area. However, there was only an extremely short window of time Swafford would have had to abduct the victim from the gas station and murder her at a different location since the record established that he arrived at his campsite alone around sunrise.
■■ The trial record established that on February 14, 1982, the victim disappeared from the FINA gas station between 6:17 and 6:20 a.m. In the early morning hours on February 14, Swafford was with Patricia Atwell, the performer who worked at the Shingle Shack. She testified that after her work shift concluded around 3 a.m., Swafford picked her up and together, they went to the home of one of Swafford’s friends and remained there until 6 a.m., during which time the couple had consensual sexual relations. Atwell knew “without a doubt” that Swafford drove her back to the Shingle Shack around 6 a.m. because she needed to pick up her child. The FINA station was located between the Shingle Shack and Tomoka State Park, where Swafford and his four friends were camping so they could attend the Daytona 500. Most of Swafford’s friends (Ricky Johnson, Chan Hirtle, and Carl Johnson) testified that Swafford arrived back at the campground before sunrise, between 6 a.m. and 6:30 a.m., based on the brightness of the sky — the sky was beginning to lighten up and the ground was visible, but one could not see very far because it was still somewhat dark. Roger Harper was the only witness who testified that Swafford came back a little after daylight broke. The trial court took judicial notice that sunrise occurred at 7:04 a.m. on that day. Therefore, although Swafford was in the proximity of the crime scene, the window of opportunity to abduct and murder the victim was only approximately thirty minutes. In addition to the lack of evidence linking Swafford to th.e murder weapon, and the very short window of time in which Swafford could-have committed the murder, no physical evidence links Swaf-ford to the murder and neither Swafford’s vehicle nor Swafford match the description of the person seen at the FINA station near the time of the kidnapping.
A review of the evidence presented at trial demonstrates that the impact of removing the sexual battery charge, and the supporting evidence pertaining to that charge, changes the essential nature of the case presented by the State. However, our precedent also establishes that we must consider the. cumulative effect of all of the evidence that would be admissible at a new trial.
. B. Cumulative Effect
The Jones standard requires that, in considering the effect of the newly discovered evidence, we consider all of the admissible evidence that could be introduced at a new trial. Jones II, 709 So.2d *776 at 521. In determining the impact of the newly discovered evidence, the Court must conduct a cumulative analysis of all the evidence so that there is a “total picture” of the case and “all the circumstances of the case.” Lightbourne v. State, 742 So.2d 238, 247 (Fla.1999) (quoting Armstrong v. State, 642 So.2d 730, 735 (Fla.1994)). As this Court held in Lightboume, a trial court must even consider testimony that was previously excluded as procedurally barred or presented in another proceeding in determining if there is a probability of an acquittal. Id.; see also Roberts v. State, 840 So.2d 962, 972 (Fla.2002) (holding that upon remand, if the trial court determined that the testimony in a newly discovered evidence claim was reliable, the trial court must review that new evidence as well as Brady claims that were previously rejected in a prior postconviction motion because the evidence was equally accessible to the defense and there was no reasonable probability that the result of the trial would have been different had the evidence been disclosed). Thus, contrary to the dissent’s view, this requirement not only is consistent with our precedent, but is also consistent with logic, as the Jones standard focuses on the likely result that would occur during a new trial with all admissible evidence at the new trial being relevant to that analysis.
The evidence regarding the gun and the timeline must be considered in conjunction with other evidence that could be admissible at a new trial, including evidence that presents serious questions as to whether Swafford was even able to commit this murder.
In this case, the victim was found on a dirt road after she had been shot nine times. The police were able to recover only those bullets that were removed during the autopsy. However, four bullets and one bullet fragment exited her body. The police diligently searched the area for the missing bullets, using a high-powered metal detector that would have located the bullets even if they were buried more than a foot into the ground, but they could not find any bullets, bullet fragments, or casings. The officers did not testify that the area had any drag marks to indicate that the victim was dragged to that location.
Thus, based on the evidence found at the site and the evidence that was missing, it is likely that the victim was killed in a different location and her body was disposed of on the side of the dirt road. However, Swafford was borrowing his friend’s vehicle at the time of the murder, and while his friends testified about the condition of the vehicle the next morning, none of his friends testified that they saw blood in the car or that they saw blood on Swafford. In fact, the police conducted a full examination of the vehicle, and no blood or hair evidence was ever found.
In addition, under Jones and Lightb-oume, we also must consider the testimony of Michael Lestz that points to another viable suspect — testimony that would be admissible at a retrial — when evaluating the totality of admissible evidence. Specifically, this evidence showed that there was another suspect, Michael Walsh, who matched the BOLO (“be on the look out” alert) created after a witness described a man who was outside of the FINA gas station with the victim at 6:17 a.m. on February 14, 1982; that Walsh’s wife’s vehicle was similar to the description of the vehicle at the FINA gas station where the victim was abducted; that Walsh was at the Shingle Shack on the evening of February 14; that Walsh was anxious to dispose of a hammerless .38 handgun with a wood handle — a description that matches the murder weapon; that Walsh was known to reload his own ammunition, which is relevant since reloaded ammuni *777 tion was used in this murder; and that Walsh actually possessed the BOLO containing the police composite sketch for the instant murder when he was arrested in Arkansas for an unrelated robbery.
Even before law enforcement investigated Swafford in connection with the murder, their initial leads pointed them to Michael Walsh in March 1982. Specifically, Walsh and Lestz were arrested in Arkansas, during which time the Arkansas police found a flyer in Walsh’s possession that contained the BOLO involving the murder in this case. The Arkansas police then contacted Volusia County law enforcement and informed them that Walsh “strongly resembled” the individual depicted in the BOLO. According to two different witnesses — Lestz and Walter Levi — in the early morning hours of February 14, around 6 a.m., Walsh dropped Levi and Lestz off at a laundromat, stating that he needed to purchase drugs. However, unlike usual, Walsh did not quickly return. Instead, he was gone for more than four hours, and when he did return, he was sweaty, nervous, and hyper. This information was given to Volusia County deputies, and when they investigated, they learned that the laundromat identified was a mere half block from the FINA station where the victim was abducted.
Significantly, even before the police had identified the murder weapon, Lestz also informed the police that around the time in question, Walsh was anxious to dispose of two .38s, and described one of them as a hammerless .38 with a wooden or brown handle, a description matching the murder weapon in this case. The fact that Lestz testified that Walsh was attempting to dispose of two .38s is relevant to the facts of this case, where the victim was shot nine times, requiring either the use of two guns or the murder weapon to be reloaded — a fact that this Court noted on direct appeal. See Swafford, 533 So.2d at 272. None of this evidence was introduced at the original trial because Swafford’s defense attorneys did not have this information at the time, but all of this evidence could be introduced at a new trial.
During postconviction proceedings, Levi, Lestz, and numerous officers testified to additional information. Levi and Lestz both testified that Walsh was in the business of stealing and selling stolen guns. Levi testified that he and Walsh would target restaurants and attractions like Sea World and wait until people left their vehicles and then steal things from the vehicles. On the evening of the Daytona 500, Lestz testified that Walsh was anxious to get rid of two .38 handguns. On February 14, the same evening that Swafford went to the Shingle Shack, Walsh and Lestz also went to the Shingle Shack. However, while Walsh and Lestz visited about three bars together that evening, when they went to the Shingle Shack, only Walsh entered while Lestz waited in the van for Walsh to return. Later, Lestz and Walsh saw flyers involving the murder, and in response, Walsh ripped the flyers off of other cars and defaced one of the flyers.
This testimony from two witnesses concerning. Walsh’s involvement with dealing in stolen guns is highly relevant in light of the fact that during Swafford’s trial, there was testimony that the murder weapon was stolen from Nashville, Tennessee, where Swafford lived. This testimony regarding Walsh places that trial evidence in a different light since one of Walsh’s stolen guns could have easily come from Nashville — one of the largest cities in the southeast.
In addition, the evidence shows that Walsh matched the description of the individual that law enforcement were looking for during the investigation of the murder, and his wife’s car was similar to a descrip *778 tion of a car seen at the FINA station. Lestz’s testimony is supported and corroborated by Levi’s testimony, who observed the same actions and testified as to his involvement in the stolen gun trade. Lestz’s testimony is further supported by the fact that law enforcement found a flyer involving the murder in Walsh’s possession when he was arrested. Finally, this new evidence does not involve anyone who has a bias in favor of Swafford or who even knows Swafford.
In other words, along with the circumstantial evidence relied upon in the case, Swafford’s jury never heard that there was another viable suspect, Michael Walsh, who matched the description of the person seen at the FINA station around the time of the kidnapping, who was also in the vicinity of the abduction- site, who had a vehicle matching the description of the vehicle at the abduction site, who himself had possession of the same type of gun that turned out to be the murder weapon, who was in the same bar where the police recovered the murder weapon, and who had the opportunity to abduct and murder the victim.
Although the dissent asserts that the jury resolved the conflicting evidence as to the dispute concerning in which restroom the gun was found, the evidence presented to the jury involved only one gun and only one possible suspect. Based on our precedent, this Court is required to review the newly discovered evidence, along with all other admissible evidence that could be introduced at a new trial, and' consider the impact of such evidence upon the jury, see Jones II, 709 So.2d at 521, in order to provide a “total picture” of the case. Lightbourne, 742 So.2d at 247.
Here, the jury was never presented with the evidence as to the new suspect, which completely changes the character of the conflicting testimony as to the gun and could provide an explanation as to how this conflict occurred. In other words, contrary to the dissent’s view, we are not reweighing the evidence but are simply reviewing the newly discovered evidence, in conjunction with all of the evidence admissible at a new trial, to determine whether it has “weakened] the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability.” Jones II, 709 So.2d at 526.
In considering the totality of the newly discovered evidence pertaining to the forensic testing, the remaining circumstantial evidence presented by the State at trial, and the evidence that defense counsel could present at a new trial, we conclude that the newly discovered evidence in combination with the evidence developed in postconviction proceedings is of “such nature that it would probably produce an acquittal on retrial” because it meets this standard. Jones II, 709 So.2d at 523, 526 (quoting Jones, 678 So.2d at 315). Accordingly, we vacate the first-degree murder conviction.
CONCLUSION
Based on the fact that this case rested on circumstantial evidence that relied heavily on the premise that Swafford had committed a murder in conjunction with a sexual battery, the newly discovered forensic evidence regarding the alleged sexual battery changes the entire character of the case and affects the admissibility of evidence that was originally presented to the jury. No witness,. DNA, or fingerprints link Swafford to the victim or the murder weapon.
In reviewing the evidence in this case, we conclude that there is a reasonable doubt as to Swafford’s guilt, and the newly discovered evidence, when considered in conjunction with the evidence presented at trial, leads to a significant probability that *779 he would be acquitted of sexual battery and first-degree murder — and at the very least avoid being subject to the death penalty without the sexual battery aggravator.
For all the reasons set forth in this opinion, we vacate the convictions for sexual battery and first-degree murder, vacate the sentences, and remand for a new trial because the newly discovered evidence weakens the case against Swafford to such an extent that it gives rise to a reasonable doubt as to his culpability.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., dissents with an opinion in which POLSTON, C.J., concurs.

. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.

. Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

. Choline is found in high concentrations in semen.

. To prove that he was not aspermic, Swaf-ford testified in this proceeding that he never had a vasectomy and that he had fathered a child in 1981.

. Williams v. State, 110 So.2d 654 (Fla.1959).