# Supreme Court of Florida

_____

No. SC12-2101
_____

**PAUL CHRISTOPHER HILDWIN,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 26, 2014]

PER CURIAM.

Paul Christopher Hildwin appeals from the denial of postconviction relief in this death penalty case. We reverse and conclude that newly discovered evidence that identifies the donor of DNA left at the crime scene compels that a new trial be granted.[1] The newly discovered DNA evidence now establishes that the victim's boyfriend, William Haverty, and <u>not</u> the defendant, Hildwin, was the provider of

---

1. We have jurisdiction of Hildwin's appeal under article V, section 3(b)(1), of the Florida Constitution because the lower court's order concerns the denial of postconviction relief from a capital conviction for which a sentence of death was imposed.

biological material found on two items at the crime scene: a pair of women's underwear and a white washcloth.  Importantly, this new scientific evidence completely changes the nature of the evidence relied upon by the State at trial, since at trial, the State introduced the underwear and washcloth to show that the biological material left on the items was <u>consistent</u> with the defendant, Hildwin, and was <u>inconsistent</u> with Haverty.  Hildwin's defense, however, maintained that Haverty killed the victim.

In other words, this new scientific evidence completely discredits the scientific evidence that the State relied upon at trial when the State argued that Hildwin's defense was not supported by the evidence.  In fact, exactly the opposite has now been shown to be true—the biological material matches the very person that Hildwin argued at trial was responsible for the murder.

Specifically, at trial, the State prosecuted the case based on a false theory of scientific evidence that was woven throughout its presentation of evidence and argument—scientific evidence that has now been totally discredited.  At trial, the State relied on the biological material left on the underwear and washcloth to refute Hildwin's version of the events, asserting that serological analysis of the biological material demonstrated that the DNA belonged to a nonsecretor—one who does not secrete blood into other bodily fluids—and thus the biological material could not belong to Haverty, as Hildwin claimed, because Haverty was a secretor.

Moreover, the State presented evidence that Hildwin was a nonsecretor and further relied on evidence showing that nonsecretors made up only eleven percent of the male population. During the postconviction proceedings, new DNA testing was conducted on the biological material, and after the DNA results were inputted to computer DNA indexing systems, the DNA found on both items has been shown to match Haverty—not Hildwin. Thus, the scientific evidence relied upon at trial has been proven to be false, and the new scientific evidence actually supports Hildwin's defense.

The State cannot now distance itself from the evidence and theory it relied upon at trial by arguing that it could have still convicted Hildwin without any of the now-discredited scientific evidence. While that might be possible, we cannot turn a blind eye to the fact that a significant pillar of the State's case, as presented to the jury, has collapsed and that this same evidence actually supports the defense theory that Hildwin presented at trial.

In light of the evidence presented at trial, and considering the cumulative effect of all evidence that has been developed through Hildwin's postconviction proceedings, we conclude that the totality of the evidence is of "such nature that it would probably produce an acquittal on retrial" because the newly discovered DNA evidence "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones v. State (Jones II), 709 So. 2d 512,

521, 526 (Fla. 1998) (quoting Jones v. State (Jones I), 678 So. 2d 309, 315 (Fla.

1996)).  For the reasons set forth below, we vacate Hildwin's conviction for first-

degree murder, vacate the sentence of death, and remand for a new trial.

**FACTS**

On direct appeal, this Court summarized the facts presented at trial as

follows:

> Appellant was arrested after cashing a check purportedly
> written to him by one Vronzettie Cox, a forty-two-year-old woman
> whose body had been found in the trunk of her car, which was hidden
> in dense woods in Hernando County.  Death was due to strangulation;
> she also had been raped.[2]  Evidence indicated she had been killed in
> a different locale from where her body was found.  Her purse, from
> which some contents had been removed, was found in dense woods,
> directly on line between her car and appellant's house.  <u>A pair of
> semen-encrusted women's underpants was found on a laundry bag in
> her car, as was a sweat-stained wash rag.  Analysis showed the semen
> and sweat came from nonsecretor (i.e., one who does not secrete
> blood into other bodily fluids).[3]  Appellant, a white male, was found
> to be a nonsecretor; there was testimony that white male nonsecretors
> make up eleven percent of the population.</u>
> The victim had been missing for four days when her body was
> found.  The man she lived with, one Haverty, said she had left their
> home to wash clothes at a coin laundry.  To do so, she had to pass a
> convenience store.  Appellant's presence in the area of the store on the
> date of her disappearance had come about this way: He and two
> women had gone to a drive-in movie, where they had spent all their

---

2. This Court later clarified that the case was never prosecuted as a rape
case.  Hildwin v. State (Hildwin II), 951 So. 2d 784, 789 n.2 (Fla. 2006).

3. The underwear, together with a pair of blue jean shorts, and washcloth
were within and at the very top of an open plastic bag that Cox was using as a
laundry bag.  Saliva, not sweat, on the washcloth was identified as having been
deposited by a nonsecretor.

- 4 -

money.  Returning home early in the morning, their car ran out of gas. A search of the roadside yielded pop bottles, which they redeemed for cash and bought some gasoline.  However, they still could not start the car.  After spending the night in the car, appellant set off on foot at 9 a.m. toward the convenience store near the coin laundry.  He had no money when he left, but when he returned about an hour and a half later, he had money and a radio.  Later that day, he cashed a check (which he later admitted forging) written to him on Ms. Cox's account.  The teller who cashed the check remembered appellant cashing it and recalled that he was driving a car similar to the victim's.

The check led police to appellant.  After arresting him the police searched his house, where they found the radio and a ring, both of which had belonged to the victim.  Appellant gave several explanations for this evidence and several accounts of the killing, but at trial testified that he had been with Haverty and the victim while they were having an argument, and that when Haverty began beating and choking her, he left.  He said he stole the checkbook, the ring, and the radio.  Haverty had an alibi for the time of the murder and <u>was found to be a secretor</u>.

Appellant made two pretrial statements that are pertinent here. One was a confession made to a cellmate.  The other was a statement made to a police officer to the effect that Ms. Cox's killer had a tattoo on his back.  Haverty had no such tattoo, but appellant did.

<u>Hildwin v. State</u> (<u>Hildwin I</u>), 531 So. 2d 124, 125-26 (Fla. 1988) (emphasis added).

In the guilt phase of Hildwin's trial, the State introduced two items found at the crime scene: a pair of women's underwear and a white washcloth.  The women's underwear was found inside blue jean shorts that matched a description of the clothing in which the victim was last seen, with the washcloth discovered nearby.  Both items were found in the backseat of the victim's vehicle at the very top of a bag of dirty laundry, and the victim's naked body was in the trunk of that vehicle.  The State presented evidence showing that a serological analysis

determined that semen from the underwear and saliva from the washcloth came from a nonsecretor and that Hildwin, a white male, was a nonsecretor, a subgroup of the population that encompassed only eleven percent of the total male population. The victim's boyfriend, Haverty, on the other hand, was a secretor.

Thus, the State was able to argue at Hildwin's trial that scientific evidence showed that the biological material was inconsistent with having been left by Haverty and was consistent with having been left by Hildwin. However, the evidence was not of such a nature that it positively identified the donor of the biological material.

During prior postconviction proceedings, new DNA testing conducted on the biological material left on the underwear and washcloth excluded Hildwin as the source of the semen and saliva. Hildwin asserted that he was entitled to a new trial based on that new evidence. In 2006, this Court determined by a four-to-three vote that, although this was "significant" new evidence, it did not entitle Hildwin to a new trial. Hildwin II, 951 So. 2d at 789.

Hildwin then filed an all-writs petition, seeking to have the unidentified DNA profile compared to the profiles in CODIS (the FBI-maintained DNA combined databank) and the Florida statewide DNA databank for the purpose of identifying the source of the DNA and potentially obtaining proof of Hildwin's actual innocence. The State responded that the profile was possibly not eligible to

be uploaded and that factual development might be appropriate. This Court relinquished jurisdiction to the circuit court for fact-finding regarding the DNA profile's eligibility. After an evidentiary hearing, the circuit court entered an order finding that the profile was eligible to be uploaded and searched in CODIS and the Florida databank. This Court concluded that there was competent, substantial evidence to support the circuit court's factual findings and that the profile at issue was probative and met the requirements of National DNA Index System Procedure 6.4.2, so that the DNA profile could be uploaded into the forensic index in the National DNA Index System and searched in CODIS.

After the DNA profile obtained from the underwear and washcloth were uploaded to the system, the search results revealed that the DNA matched Haverty, the victim's boyfriend, a fact revealed in a December 2011 Florida Department of Law Enforcement (FDLE) Report that was provided to Hildwin and his attorney. Hildwin then filed this postconviction motion, based on the newly discovered evidence that establishes that the DNA on the items matches Haverty, the person that Hildwin alleged committed the crime. The postconviction court denied relief.

For the reasons addressed more fully below, we reverse the postconviction court's denial of relief, vacate Hildwin's murder conviction and sentence of death, and remand for a new trial.

## ANALYSIS

In this appeal, Hildwin asserts that the postconviction court erred in denying relief because the court conducted an improper legal analysis of the newly discovered evidence claim by failing to consider the cumulative effect of all of the evidence presented during postconviction proceedings in determining the probability of acquittal. In analyzing this claim, we first review the applicable standards before we examine the postconviction court's order that denied relief.

**Applicable Standards**

As this case concerns a successive postconviction motion filed more than one year after Hildwin's conviction and sentence became final, in order for this motion to be considered, it must allege one of the following three exceptions to the one-year time bar in Florida Rule of Criminal Procedure 3.851:

> (A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or
> (B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or
> (C) postconviction counsel, through neglect, failed to file the motion.

Fla. R. Crim. P. 3.851(d)(2). Based on the claims raised, Hildwin relies on rule 3.851(d)(2)(A), the newly discovered evidence subsection.

This Court has set forth a two-prong test that a defendant must satisfy in order to obtain relief in cases involving newly discovered evidence:

To obtain a new trial based on newly discovered evidence, a defendant must meet two requirements. First, the evidence must not have been known by the trial court, the party, or counsel at the time of trial, and it must appear that the defendant or defense counsel could not have known of it by the use of diligence. Second, the newly discovered evidence must be of such nature that it would probably produce an acquittal on retrial. See Jones v. State, 709 So. 2d 512, 521 (Fla. 1998) (Jones II). Newly discovered evidence satisfies the second prong of the Jones II test if it "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones II, 709 So. 2d at 526 (quoting Jones v. State, 678 So. 2d 309, 315 (Fla. 1996)). If the defendant is seeking to vacate a sentence, the second prong requires that the newly discovered evidence would probably yield a less severe sentence. See Jones v. State, 591 So. 2d 911, 915 (Fla. 1991) (Jones I).

Marek v. State, 14 So. 3d 985, 990 (Fla. 2009).

Based on the standard set forth in Jones II, the postconviction court must consider the effect of the newly discovered evidence, in addition to all of the admissible evidence that could be introduced at a new trial. Swafford v. State, 125 So. 3d 760, 775-76 (Fla. 2013). In determining the impact of the newly discovered evidence, the court must conduct a cumulative analysis of all the evidence so that there is a "total picture" of the case and "all the circumstances of the case." Id. at 776 (quoting Lightbourne v. State, 742 So. 2d 238, 247 (Fla. 1999)). This determination includes

whether the evidence goes to the merits of the case or whether it constitutes impeachment evidence. The trial court should also determine whether the evidence is cumulative to other evidence in the case. The trial court should further consider the materiality and relevance of the evidence and any inconsistencies in the newly discovered evidence.

- 9 -

Jones II, 709 So. 2d at 521 (citations omitted).  As this Court held in Lightbourne, and more recently in Swafford, a postconviction court must even consider testimony that was previously excluded as procedurally barred or presented in another postconviction proceeding in determining if there is a probability of an acquittal.  Swafford, 125 So. 3d at 775-76; Lightbourne, 742 So. 2d at 247; see also Roberts v. State, 840 So. 2d 962, 972 (Fla. 2002) (holding that upon remand, if the trial court determined that the testimony in a newly discovered evidence claim was reliable, the trial court was required to review that new evidence, as well as claims under Brady v. Maryland, 373 U.S. 83 (1963), that were previously rejected in a prior postconviction motion, because the evidence was equally accessible to the defense and there was no reasonable probability that the result of the trial would have been different had the evidence been disclosed).

The dissent asserts that this Court misapplies the Jones II standard, referencing the first portion of the test that newly discovered evidence must be of such a nature that it would probably produce an acquittal without reference to the second portion, defining this standard as whether the new evidence weakens the case to such an extent that it "give[s] rise to a reasonable doubt as to [the defendant's] culpability."  Jones II, 709 So. 2d at 521.  However, our application of the test, which has long been used by this Court, is fully consistent with our

- 10 -

precedent. See, e.g., id.; Marek, 14 So. 3d at 990. If reasonable doubt exists as to the defendant's culpability, a jury must resolve this factual matter—not this Court.

Upon review of a postconviction court's denial of relief pertaining to a newly discovered evidence claim, this Court "review[s] the [postconviction] court's findings on questions of fact, the credibility of witnesses, and the weight of the evidence for competent, substantial evidence." Green v. State, 975 So. 2d 1090, 1100 (Fla. 2008). However, we "review the [postconviction] court's application of the law to the facts de novo." Id.

## Postconviction Court's Order

The postconviction court reviewed Hildwin's claims and the newly discovered evidence standard, noting that the

> application and recent development of new and existing facts in this case do not lend themselves cleanly and crisply to the law under Jones . . . because the Court is placed in such a posture where it has to alternate between thinking in terms of hypothetical scenarios in the event of a retrial while also thinking about the actual events that the jury heard in light of the new DNA revelations in this case.

The court then denied relief, first stating that whether the FDLE Report would be introduced in a retrial as direct evidence was highly questionable because now that the trial testimony regarding the biological material left on the underwear and washcloth have been "flatly controverted and rendered erroneous" by the December 2011 FDLE Report, "any issue involving the DNA in this case becomes greatly marginalized" and "the use of DNA in this case may be abandoned as this

- 11 -

evidence is not now relevant or germane to any issue in the case and thus serves no probative value."

According to the postconviction court, the DNA found on the women's underwear, which has now been matched to Haverty, would not serve any useful purpose in supporting Hildwin's theory of the case because the victim lived with Haverty. Furthermore, the postconviction court held that the DNA found on the washcloth would likely not be admissible during a retrial based on "problems of authentication, relevance, materiality, proper predicate, the chain of custody of this 'white rag,' and other such issues under the evidence code." The postconviction court therefore denied relief, concluding that even if the DNA evidence from these items were admissible, this evidence would not likely result in an acquittal of Hildwin when considering the additional circumstantial and direct evidence of Hildwin's guilt that the State presented at trial.

Thus, the postconviction court based its denial of relief on two determinations: (1) the newly discovered evidence would likely not be admissible in a retrial; and (2) even if the evidence were admissible, it would not likely result in an acquittal of Hildwin. We address each of these determinations separately.

**Admissibility of Newly Discovered Evidence**

As an initial matter, the postconviction court's denial of relief substantially centered on its determination that the newly discovered evidence identifying

Haverty as the donor of the DNA would likely not be admissible in a retrial. The court, however, provided no analysis on this point other than mentioning that the admissibility of the white washcloth containing saliva and found at the crime scene turned on Hildwin's statement to Jane Phifer, a law enforcement officer with whom Hildwin discussed his knowledge of the events. While the postconviction court focused mostly on the admissibility of the physical evidence containing the biological material and found that this evidence would not be admissible at a retrial, this determination would also impact the admissibility of the newly discovered evidence that demonstrates Haverty as the source of the DNA—without the physical evidence containing DNA, the report stating the source of the DNA would not be pertinent.

Specifically, DNA testing was conducted on biological material found on two items: semen on underwear found inside a pair of blue jean shorts that was consistent with clothing that the victim was wearing when she disappeared; and saliva on a white washcloth found in the same location as the underwear—on the top of a bag of dirty laundry in the car where the victim's body was discovered. As to the washcloth, when Hildwin was discussing his knowledge about the victim's death with law enforcement, he told Phifer that he saw the victim's boyfriend begin to strangle her and afterwards, the victim's boyfriend wiped his head with a "white rag" and "threw the rag to the ground."

The postconviction court noted that the washcloth introduced at trial was found on top of a bag of dirty laundry, as opposed to being found "on the ground," and held that this "discrepancy" would lead to admissibility issues during a retrial. The postconviction court further stated that the admissibility of the washcloth turned on the fact that the evidence at trial did not provide definitive proof that the "white rag" Hildwin saw being used by the killer was the same white washcloth that police found in the victim's car. The postconviction court therefore concluded that the newly discovered evidence as to the DNA identification of Haverty would be inadmissible at a retrial based on problems with authentication, relevance, materiality, and the chain of custody of the washcloth, even though the washcloth was admitted during Hildwin's original trial. We consider each of these reasons in turn.

As to authentication, while authentication of evidence is required as a condition precedent to its admissibility, authentication is "satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." § 90.901, Fla. Stat. (2013). In this case, the items of evidence in question were found in the victim's car, in which the victim was also found, and were all admitted at the initial trial. The fact that the DNA testing of the biological material left on these items is now consistent with Haverty, instead of Hildwin, does not change the authenticity of the evidence in question.

- 14 -

Next, the postconviction court held that the washcloth could be inadmissible at a retrial based on problems with relevancy and materiality. "Relevant evidence is evidence tending to prove or disprove a material fact." § 90.401, Fla. Stat. (2013). Because Hildwin stated that he saw the killer use a "white rag" to wipe his forehead, DNA found on a white washcloth would support the defense theory of the events and would tend to prove or disprove a material fact. Further, as it was required to do at the initial trial, the jury must determine the weight to be given to the evidence and resolve questions surrounding whether the "white rag" referenced by Hildwin and the white washcloth found at the crime scene were the same item.

Likewise, the results of a DNA analysis of semen found in the underwear that appeared to be the clothing that the victim wore when she disappeared is relevant. Again, these items were found on the very top of the bag of dirty laundry in the victim's car, and the victim was found in the trunk of her car, nude. The fact that questions may exist as to the appropriate weight to be given to the evidence does not equate to a determination that the evidence is not relevant or material.

Finally, the postconviction court stated that the evidence may be inadmissible based on problems pertaining to the chain of custody. Chain of custody claims come into issue when a party asserts that probable tampering occurred to relevant physical evidence. As this Court has held, "a sufficient showing of the chain of custody is made where the object has been kept in proper

custody since the time it was under possession and control until the time it is produced at trial." Armstrong v. State, 73 So. 3d 155, 171 (Fla. 2011); see also Charles W. Ehrhardt, Florida Evidence §901.3, at 1099 (2013 ed.) ("Normally, this showing is made by establishing a chain-of-custody of the evidence from the time it was first acquired by the police."). Chain of custody is not at issue here, where Hildwin testified that he saw the killer use a "white rag" to wipe his face and a white washcloth was subsequently found in the victim's car. It is up to the jury to determine, as it was required to do at the original trial, whether the "white rag" referenced by Hildwin is the same item as the white washcloth found at the crime scene, as well as the value and weight of the evidence.

In conclusion, the postconviction court erred in holding that the results from the DNA testing would be inadmissible at a retrial. This evidence cannot be excluded merely because the new scientific evidence is contrary to the scientific evidence that the State relied upon in order to secure a conviction at the original trial. Questions surrounding the materiality of the evidence and the weight to be given such evidence are for the jury.

**Likelihood of Acquittal Based on Newly Discovered Evidence**

The postconviction court also denied relief based on its finding that the newly discovered evidence identifying the source of the DNA had little probative

- 16 -

value and would not likely result in an acquittal. Specifically, the court stated as follows:

> [T]his Court firmly believes that if the FDLE Report were to be introduced at a retrial of the Defendant it would have very little probative value and significance and would not likely result in an acquittal of the Defendant, when considering the voluminous amount of additional circumstantial and direct evidence that the State presented at trial that the Defendant failed to blunt, even after having the opportunity by taking the stand and testifying.

However, the postconviction court also recognized that it had difficulties in analyzing this case because the court was "placed in such a posture where it has to alternate between thinking in terms of hypothetical scenarios in the event of a retrial while also thinking about the actual events that the jury heard in light of the new DNA revelations in this case."

Based on the standard set forth in Jones II, 709 So. 2d at 526, the postconviction court must consider the effect of the newly discovered evidence, in addition to all of the admissible evidence that could be introduced at a new trial, and conduct a cumulative analysis of all the evidence so that there is a "total picture" of the case and "all the circumstances of the case." Swafford, 125 So. 3d at 776 (quoting Lightbourne, 742 So. 2d at 247). The newly discovered evidence, when considered together with all other admissible evidence, must be of such nature that it would probably produce an acquittal on retrial, a standard that is satisfied if the newly discovered evidence "weakens the case against [the

defendant] so as to give rise to a reasonable doubt as to his culpability." Jones II, 709 So. 2d at 526 (quoting Jones I, 678 So. 2d at 315).

Although this Court gives deference to a postconviction court's credibility determinations, in this case, there were no factual findings regarding credibility. The DNA evidence proving that Hildwin was not the source of the biological material and that Haverty was the source is uncontradicted. While the State attempts to minimize the significance of this newly discovered DNA evidence by asserting that it did not approach this case as a rape case, the State certainly presented evidence and argument consistent with a rape having occurred prior to the murder.

In fact, the State heavily relied on the scientific evidence at trial that pointed to Hildwin as the person who murdered the victim and also excluded Haverty, the person that Hildwin alleged was the actual murderer. The State presented evidence at trial that the victim was found naked in the trunk of her car, with her T-shirt tied around her neck, her blue jean shorts and underwear missing, and her torn bra and shoes found in the woods. A pair of blue jean shorts, with underwear inside of them, was found on the top of a bag of dirty laundry inside the victim's car. Near the shorts and underwear was a white washcloth. The State presented evidence pertaining both to the biological material on the underwear that the victim likely

wore on the day she disappeared and to the biological material on a white washcloth found in the same location.

Specifically, the scientific testing revealed that both the semen on the underwear and the saliva on the washcloth belonged to a nonsecretor—a subgroup of the population to which only eleven percent of the overall male population belonged. In addition, the State further presented evidence that the victim's live-in boyfriend, Haverty, could not have been the producer of the biological material found on these items because he was a secretor. Hildwin, however, was a nonsecretor, which matched the State's theory of the case and discredited Hildwin's.

Hildwin testified at trial, asserting that the last time he saw the victim, her boyfriend was choking her during a fight the couple had while they were driving Hildwin to his house. According to Hildwin, both the victim and Haverty picked him up, and while taking him home, the couple began to fight and exited the car. Hildwin testified that he took a checkbook from the victim's purse, and the checkbook contained a side pocket with some rings in it. Hildwin stated that the last time he saw the victim, Haverty had his hands around her neck.

In rebuttal, the State called Jane Phifer, a law enforcement officer to whom Hildwin had provided a statement. In that statement, Hildwin stated that he saw the person who committed the murder and further explained that the man who

choked her then wiped his head with a "white rag" and threw it on the ground. In addition, Hildwin told Phifer that the killer had a cross tattoo on his back—a tattoo that was consistent with Hildwin but not with Haverty. Finally, Phifer testified that when Hildwin was discussing what he witnessed, he did not name the man killing the victim, and in fact told Phifer that he did not know Haverty. Thus, the State implied that Hildwin was confessing to killing the victim without using his own name.

Although the case was not prosecuted as a rape case, the clear implication of a sexual battery was present throughout the trial. During opening statements, the State informed the jury that it would be presenting scientific evidence to show that semen on the victim's underwear had the same blood characteristics as Hildwin's. The State discussed this evidence again during its rebuttal closing arguments in response to Hildwin's argument that the semen may have come from a consensual sexual encounter between the victim and another man. The State again stressed that the serological evidence showed that only eleven percent of the male population were nonsecretors and that Hildwin was a nonsecretor. Further, the State disputed that any consensual sexual act occurred based on the condition of the victim's bra, which had been torn off. In fact, even this Court on direct appeal twice referred to the victim being raped. Hildwin I, 531 So. 2d at 125 ("[S]he also

had been raped"); id. at 128 ("[T]he evidence points convincingly to a conclusion that [Hildwin] abducted, raped, and slowly killed his victim . . . .").

In a prior postconviction proceeding, this Court considered but ultimately denied relief based on then-newly discovered evidence that disproved the scientific evidence presented at trial regarding the serological blood testing, which showed that the biological material left on the items in question came from a nonsecretor, and Hildwin was a nonsecretor. However, the evidence presented in the prior proceeding is different and distinct from the evidence now presented. Specifically, the evidence at trial showed merely that the biological material left on the items came from a nonsecretor—a fact that was later shown to be incorrect in a prior postconviction proceeding. The evidence presented at trial did not show that the biological material matched any particular person. Thus, even though the new testing from that prior postconviction proceeding positively excluded Hildwin as the source of the DNA, the initial evidence relied upon at trial had never positively identified Hildwin as the source of the biological material, so new evidence excluding him was not as significant. Now, however, the scientific evidence has established that the DNA found at the crime scene matches the very person who Hildwin alleged committed the murder. This issue as to whether Hildwin or Haverty committed the murder was contested to the jury, with significant credibility determinations and suspicious behavior on both sides.

From opening statement to closing argument, the State clearly relied on the

scientific evidence to imply that Hildwin raped the victim.  First, in the opening

statement, the prosecutor told the jury:

> [Police] found a bag of dirty laundry in the car . . . .  Finally taken
> from that laundry bag was a pair of women's [shorts] sitting on top of
> the laundry bag, a pair of women's panties and a wash rag.  Now on
> those women's panties was some semen and it has the same blood
> characteristics that the defendant has.  And there will be an expert
> from the FBI to testify to you about that.  On the wash rag there are
> characteristics of human sweat that is consistent with this defendant.

In closing argument, after introducing the scientific evidence to point to Hildwin as

the source of the semen, the State argued:

> What's interesting about that is that on these panties that were
> found—these panties were found in the car on top of the laundry,
> Sergeant Haygood testified to, not in the laundry, on top of the
> laundry.  These panties contained semen that is consistent with the
> non-secretor 11 percent of the white male population, consistent with
> the defendant in this case and not consistent with Bill Haverty.  This
> wash rag had saliva from a non-secretor consistent with Paul Hildwin,
> the defendant, not consistent with Bill Haverty.
>> And before we go any further, remember the statement that the
> defendant made to Investigator Phifer that after—after Vronzettie Cox
> was choked to death, the man that did it wiped his face with a white
> rag.  Now, these two pieces of evidence, ladies and gentlemen, I'm
> not asking you in any way, shape, or form to convict the defendant,
> Paul Hildwin, based on those panties and that wash rag.  What I am
> telling you is that it is one more block.  It is one more piece of
> evidence that leads to Paul Hildwin, and it is one more piece of
> evidence that eliminates Bill Haverty.  While that 11 percent of the
> population are non-secretors, remember it would have to be a non-
> secretor like the defendant in the same place at the same time with the
> same opportunity to be the same because it makes those odds look
> high for someone other than the defendant.

(Emphasis added.)

This Court's opinion in Hildwin's direct appeal demonstrates the impact of the scientific evidence presented at trial. Although the State did not charge Hildwin with sexual battery and the trial court did not instruct the jury on sexual battery as an underlying felony for first-degree felony murder, this Court stated twice that the victim had been raped, first in an introductory paragraph setting out the facts, and then in discussing the "especially heinous, atrocious, or cruel" aggravator. See Hildwin I, 531 So. 2d at 125 ("Death was due to strangulation; she also had been raped."); id. at 128 ("[T]he evidence points convincingly to a conclusion that the appellant abducted, raped, and slowly killed his victim . . . .").

The scientific evidence almost certainly led Hildwin's jury, as it did this Court, to the conclusion that Hildwin raped the victim. The condition of the victim's body alone, found naked in the truck of her car with her bra torn, would have prompted jurors to question whether she had been raped. The scientific evidence as to the semen being inconsistent with Haverty made the issue unavoidable, prompting defense counsel to assert in closing argument a dubious theory that the victim was killed during consensual intercourse involving oxygen deprivation. The prosecutor's rebuttal argument that the victim's damaged bra demonstrated that any sexual encounter was nonconsensual provided a much more

credible explanation of the scientific evidence and the condition of the victim's body than the defense hypothesis.

In addition, the newly discovered DNA evidence now establishing Haverty as the source of the semen and saliva would have supported Hildwin's testimony that Haverty killed the victim during an argument over her seeing other men. Hildwin testified that after he obtained a ride from Haverty and the victim, he stole the victim's possessions from her car while Haverty attacked her. The scientific evidence presented at trial, however, excluded Haverty as the source of the saliva and semen. At trial, Haverty testified that the victim had gone out with other men while the two were living together, and that he "didn't like it a whole lot." Hildwin testified that Haverty became violent during an argument over the victim's behavior, striking and choking her. Hildwin further testified that after attempting unsuccessfully to separate Haverty from the victim, he took the victim's checkbook and rings and fled.

As the dissent explained in Hildwin II regarding Haverty's alibi:

> Although Haverty had an alibi, it was not ironclad. The alibi witness, George Weeks, testified that Haverty was present at home when Weeks came to mow the lawn on what could have been the morning of Cox's disappearance. However, Weeks' testimony did not match Haverty's as to the day that Weeks mowed the lawn. Weeks testified that he saw Haverty on Monday or Tuesday after the weekend that Haverty and Cox moved into the trailer, which would have been September 2nd (Labor Day) or 3rd, 1985. Haverty testified Weeks actually mowed the lawn a week later, September 9th, the day of Cox's disappearance. Clearly, one of the men was incorrect.

Further, in postconviction proceedings in 1992, an envelope with writings by Haverty found in the home he shared with Cox came to light. This piece of evidence is relevant to an analysis of the cumulative effect of newly discovered evidence. Among other messages, Haverty wrote to the victim "If you don't want to be here, leave," and "Fuck off and die." The envelope could have been used to impeach Haverty's testimony that he and Cox "got along real good" at the time of her disappearance.

Hildwin II, 951 So. 2d at 796 (Pariente, J., dissenting) (citations omitted).

Thus, the now-scientifically disproven biological evidence had three distinct impacts on Hildwin's trial: (1) it provided scientific evidence that Hildwin's theory of defense could not have occurred because the DNA on the underwear and washcloth were not consistent with Haverty but were consistent with Hildwin; (2) it supported the State's implication that Hildwin raped the victim; and (3) it supported the State's theory that Hildwin's statement to Phifer was actually a confession, in light of the fact that according to Hildwin, the unnamed killer had wiped his face with a "white rag" and the serology test showed that saliva from a white washcloth was consistent with characteristics of Hildwin's blood, and not Haverty's blood.

The fact that this scientific evidence supported the State's theory would likely be critical to the jury, particularly since the two potential suspects—Haverty and Hildwin—both acted suspiciously after the victim's disappearance. Hildwin provided numerous changing stories to law enforcement, attempting to avoid prosecution for check forgery while he was on parole. Moreover, he admitted to

being in the vehicle with the victim on the day she disappeared and to stealing her checks, rings, and radio.

On the other hand, Haverty had numerous problems regarding his trial testimony, as well. Specifically, although he testified that the victim left around 9 a.m. on September 9 to wash clothes, he did not report her missing until the victim's sister arrived in town on September 13 looking for her. In addition, evidence discovered after trial through postconviction proceedings provided further support that Haverty acted suspiciously when he helped to file the missing person's report. In fact, law enforcement found notes at Haverty and Cox's home in which Haverty had written a note to Cox that stated, "Fuck off and die"—a piece of evidence that supported Hildwin's story that the couple was fighting at the time that Cox disappeared that was not discovered until after trial during the course of postconviction proceedings in 1992. Finally, Cox's nephew also provided a statement that corroborated the rift between Cox and Haverty. These pieces of admissible evidence must be considered, as well, in analyzing the cumulative effect of the newly discovered evidence. See, e.g., Robinson v. State, 770 So. 2d 1167, 1170 (Fla. 2000) (explaining that the postconviction court must "evaluat[e] the newly discovered evidence in conjunction with evidence presented at all prior evidentiary hearings and evidence presented at trial").

The dissent ignores the disputed evidence, does not acknowledge the impact that erroneous scientific evidence would have on the jury, and avoids reviewing any of the evidence discovered after trial—evidence that would be admissible at a retrial and must be considered to obtain a full picture of the case.  Swafford, 125 So. 3d at 775-76.  For example, while the dissent states that the State presented evidence to show that Haverty was at home on September 9, 1985, it relies primarily on testimony from George Weeks, who recalled mowing Haverty's lawn before Haverty moved in on Friday, August 30, and then returned "immediately after the weekend" to finish cutting the grass—on September 2 or September 3.  The only support that Haverty's grass was mowed on September 9 came from the other suspect himself, Haverty.

Likewise, the dissent improperly attempts to reconstruct and reconcile other conflicting testimony, stating that jailhouse informant Robert Worgress heard Hildwin affirm that he killed the victim after he stabbed her first—a statement that the dissent maintains did not conflict with the physical evidence.  However, the victim was strangled to death and had only a superficial laceration injury below her neck—not a stab wound.  Moreover, as was discovered during postconviction proceedings, at the time of his trial testimony, Worgress was attempting to curry favor with the State after he was accused of lying to his probation officer and

charged with grand theft—information that the State did not disclose to defense counsel at the time of trial.

A review of the dissent illustrates that it is re-weighing the evidence and resolving all disputes in a manner to favor the jury's verdict. Further, in doing so, the dissent ignores new evidence discovered after the trial proceedings concluded. However, as addressed above, the Jones II standard requires courts to determine the probability of an acquittal by considering whether all of the new evidence as a whole weakens the case to such an extent that it "give[s] rise to a reasonable doubt" as to the defendant's culpability. Jones II, 709 So. 2d at 526. Our application of the Jones II standard in this case is consistent with how this Court has always applied this standard. See, e.g., Lightbourne, 742 So. 2d at 247; Swafford, 125 So. 3d at 775-76.

In sum, newly discovered evidence now establishes that the DNA found on the victim's underwear and on the washcloth at the crime scene belong to Haverty. The fact that the DNA on the washcloth was saliva that matches Haverty is significant because it supports Hildwin's story that he saw the killer wipe his face with a "white rag." In other words, the jury had to decide between two suspicious people—both of whom had a motive. Erroneous scientific evidence presented at trial, in addition to the newly discovered evidence identifying the DNA on both items as Haverty's, is significant evidence. In considering the evidence at trial, the

newly discovered evidence at issue now, as well as admissible evidence previously discovered in prior postconviction proceedings, we conclude that this newly discovered evidence "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability." Jones II, 709 So. 2d at 526.

## CONCLUSION

Based on the fact that this case rested on circumstantial evidence that relied on now-entirely discredited and unreliable scientific evidence, which now identifies Haverty as the donor of the biological material found on items at the crime scene, the newly discovered evidence identifying the donor of the DNA left on these items changes the entire character of the case originally presented to the jury, particularly in light of the fact that additional evidence discovered in postconviction proceedings casts further doubt on Hildwin's guilt. In reviewing the evidence in this case, we conclude that the cumulative effect of the newly discovered evidence weakens the case against Hildwin to such an extent that it gives rise to a reasonable doubt as to his culpability.

For all the reasons set forth in this opinion, we vacate Hildwin's conviction for first-degree murder, vacate the sentence of death, and remand for a new trial.

It is so ordered.

PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
LEWIS, J., concurs in result.
CANADY, J., dissents with an opinion in which POLSTON, C.J., concurs.

- 29 -

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

CANADY, J., dissenting.

I dissent from the majority's decision to vacate Paul Christopher Hildwin's conviction for first-degree murder and sentence of death. Hildwin's motion for postconviction relief is based on newly discovered evidence from DNA testing of a pair of women's underwear and a white washcloth found in the victim's car. Newly discovered evidence justifies setting aside a conviction only when that evidence—when reviewed in the full context of other admissible evidence—is "of such nature that it would probably produce an acquittal on retrial." Jones v. State (Jones I), 591 So. 2d 911, 915 (Fla. 1991). Hildwin falls far short of meeting that standard.

The majority concludes that because "the State prosecuted the case based on a false theory of scientific evidence that was woven throughout its presentation of evidence and argument" and the DNA test results would support Hildwin's defense, Hildwin is entitled to a new trial. Majority op. at 2. The majority's line of analysis—based on its conclusion that "a significant pillar of the State's case, as presented to the jury, has collapsed" due to the newly discovered evidence, majority op. at 3—misses the mark. The question is not whether the serology evidence—now revealed to be erroneous by the DNA evidence—could have affected the guilt phase trial proceedings. Instead, the question is whether the

- 30 -

DNA evidence, along with other admissible evidence, would be likely to "produce an acquittal on <u>retrial</u>." <u>Jones I</u>, 591 So. 2d at 915 (emphasis added).

On retrial, the DNA evidence would be of little consequence. When the totality of the evidence is considered, the postconviction court did not err in concluding that the newly discovered forensic evidence neither "weakens the case against [the defendant] so as to give rise to a reasonable doubt as to his culpability," <u>Jones v. State (Jones II)</u>, 709 So. 2d 512, 526 (Fla. 1998) (quoting <u>Jones v. State</u>, 678 So. 2d 309, 315 (Fla. 1996)), nor would it "probably yield a less severe sentence," <u>Henyard v. State</u>, 992 So. 2d 120, 125 (Fla. 2008) (citing <u>Jones I</u>, 591 So. 2d at 916).

First, the new DNA evidence would have little or no probative value at a retrial in establishing that William Haverty, rather than Hildwin, committed the murder. The State established that Haverty and the victim had been dating for a few months and lived together. Given the cohabitating couple's romantic relationship, the fact that DNA consistent with Haverty's DNA was extracted from the semen found on the underwear that the victim was likely wearing on the day of her murder and the saliva found on a washcloth in the couple's laundry tends only to establish that Haverty recently had sex with the victim and, at some point, used the washcloth. The presence of Haverty's DNA does not tend to prove that he murdered the victim. It would not give the jury any reason to conclude that

Haverty was the person who removed the victim's clothes, strangled her, and placed her body in the trunk of her car.

Second, the elimination of the erroneous serology evidence does not significantly weaken the case against Hildwin on retrial. Contrary to the majority's claim, the now discredited nonsecretor evidence was not "a significant pillar of the State's case." Majority op. at 3. This Court previously unequivocally rejected the view that "the serology evidence . . . was a 'scientific building block' upon which the State's entire case was built." Hildwin v. State, 951 So. 2d 784, 790 (Fla. 2006). The nonsecretor evidence was only a small portion of the overwhelming evidence—detailed below—that linked Hildwin to the crime and demonstrated his lack of credibility.

As part of its guilt phase case, the State presented evidence establishing that Hildwin had the opportunity to attack the victim on the morning of September 9, 1985. Haverty testified that the victim left their shared home at around 8:30 or 9 a.m. that morning to do laundry and to deposit a check. The State then called the two women who, the night before, went to a drive-in movie with Hildwin and became stranded with him along U.S. Highway 19 when his car ran out of gas. These witnesses explained that because the threesome had no money, they decided to spend the night in Hildwin's car. The witnesses further explained that while

Hildwin was in the car with his friends around dawn, Hildwin left the car sometime before 9 a.m. and did not return until after 10 a.m.

Helen Jean Lucash, who was Hildwin's girlfriend in September 1985, testified that when she awoke around 9 a.m. on September 9, 1985, Hildwin was not in the car. She stated that Hildwin returned around 9:30 or 10 a.m. Similarly, Cynthia Wriston, a friend of Lucash and Hildwin, testified that when she first awoke just after daylight, Hildwin was in the car but that when she awoke again around 10 a.m., Hildwin was gone. Wriston explained that Hildwin returned to the car about twenty or thirty minutes after 10 a.m. and that when he returned, Hildwin walked to the Lone Star Bar to ask the owner to take him to get gas.

The evidence also established that when Hildwin returned to the car, he had cash. Lucash testified that while Hildwin had no money when they went to sleep, he had money for sodas and gas when he returned. Charles Schelawske, the owner of the Lone Star Bar, testified that sometime before the bar opened at 11:30 a.m., he drove Hildwin to a nearby convenience store to buy gas. A register tape from the store established that Hildwin bought two dollars' worth of gas at 10:44 a.m., and Donna Ann Lucier, who was working at the convenience store that morning, testified that Hildwin paid for the gas with two one-dollar bills, not with loose change as Hildwin had claimed.

The amount of time that Hildwin was away from his friends was sufficient for him to have committed the crime. Detective Ralph Eugene Decker of the Hernando County Sheriff's Office testified that he and another officer drove from the Lone Star Bar to the pine forest where the victim's shoes were found, approximately six-tenths of a mile north of Centralia Road in Brooksville, Florida. That drive took ten minutes. Detective Decker, dressed in plain clothes, then walked to Hildwin's home, stayed at Hildwin's home for five minutes, and began walking back to the Lone Star Bar. Despite there being only light traffic, Detective Decker was offered a ride by a passing motorist, which he accepted. This portion of the trip took only twenty-two minutes.

In contrast to Hildwin's proximity to the crime scene on the morning of September 9, 1985, the State presented evidence that Haverty was at home that morning. Haverty testified that he and the victim moved into their home on Friday, August 30, 1985, and that a little over a week later, on September 9, 1985, his landlord's brother arrived to mow the lawn. Haverty stated that the man began mowing between 8 a.m. and 9:30 a.m. and finished around 1 or 2 p.m. The State also called George James Weeks, who testified that he began mowing the lawn of his sister's rental property on the Thursday or Friday before new tenants were scheduled to move in but did not finish the lawn because his mower blade was dull. When asked when he returned, Weeks answered, "immediately after the

weekend, about Monday or Tuesday," which would have been September 2 or September 3, 1985—not September 9, 1985. But when again asked when he returned and if it was "immediately after the weekend [that] they had moved in," Weeks equivocated, stating: "I believe it was, yes, sir." Despite his uncertainty about the date, Weeks' testimony was consistent with Haverty's testimony on other details. Weeks stated that he began mowing at approximately 9 a.m. and did not finish until after noon. Weeks also testified that he was greeted by Haverty when he first arrived and that he did not see Haverty's vehicle leave the property that morning.

Next, the State presented evidence rebutting Hildwin's implausible testimony about his encounter with the victim on the morning of September 9, 1985. At trial, Hildwin testified that he was offered a ride by his "friend" Haverty and Haverty's girlfriend. According to Hildwin, as the threesome drove toward Hildwin's home, the couple began to argue, and when the victim had difficulty driving her car on a sand-paved road, they stopped. Hildwin explained that once stopped, the couple's argument escalated and Haverty began to choke the victim. Hildwin then walked away, leaving the victim with Haverty and taking her radio and her checkbook, in which he later discovered two rings.

In addition to being inherently implausible, Hildwin's testimony that Haverty choked his girlfriend and then allowed the only witness to the crime to

- 35 -

casually walk away—carrying the victim's radio—was inconsistent with Hildwin's prior statements and the physical evidence presented at trial. In his pretrial statements given to law enforcement officers, Hildwin first claimed that either the victim was alone in the car or with one of Hildwin's former coworkers when she stopped to give Hildwin a ride. After the coworker was discovered to have an alibi, Hildwin changed his statement and informed law enforcement officers that the victim's boyfriend was present when the victim stopped to give Hildwin a ride. According to Hildwin, the boyfriend who choked the victim had a tattoo of a cross on his back. In contrast to his trial testimony identifying Haverty as a "friend," when asked during a pretrial statement if the victim's boyfriend was Haverty, Hildwin answered: "I do not know Bill Haverty." Also at trial, Hildwin was forced, over defense objection, to show the jury the tattoo on his back, which he admitted looked like a cross. Haverty, in turn, testified that he did not know Hildwin until Hildwin was accused of the victim's murder, and Haverty demonstrated to the jury that he did not have a tattoo on his back.

The State also presented evidence challenging Hildwin's trial testimony that he sat in the backseat of the car while Haverty and the victim occupied the front seats. Tony Woodall testified that at around noon on September 13, 1985, he discovered a car stuck in the mud near a road that had been flooded by a recent hurricane. Woodall explained that in the backseat of the car he saw "bags of

- 36 -

clothes and fishing equipment in the floorboard." As the State asserted during closing arguments, these items left little room in the backseat for a passenger. The State also presented evidence that a hair—which like Hildwin's hair was dark brown near the root but artificially bleached near the tip—was found in the driver's seat of the victim's car.

Additional forensic evidence implicated Hildwin and exculpated Haverty. The victim's car and some of her possessions were found in locations that supported the State's theory that Hildwin took the victim into a pine forest, strangled her, hid her body in the trunk, walked to his own home, and then hours later, used the victim's car to drive to a bank. Specifically, in a pine forest about 300 feet from the Oregon Trail on the north side of Centralia Road, law enforcement officers discovered a piece of door molding, which was determined to be from the victim's car; several National Enquirer magazines, which the victim was known to keep in her car; and a pair of sandals, identified as belonging to the victim. Near these items, a law enforcement officer observed indentations that appeared to be tire tracks. Given that there were pine needles stuck to the victim's body but no pine trees near where the victim's car was discovered, this pine forest was likely where the victim was strangled and placed in her trunk. And when a law enforcement officer walked a direct route between the items in the pine forest and Hildwin's nearby home, he found a purse, which contained a torn bra and the

victim's Social Security card. The purse, which was partially covered with leaves, was only a quarter of a mile from Hildwin's home.

In contrast, the location of these items did not support Hildwin's testimony that Haverty attacked the victim. At trial, Hildwin did testify that the victim turned north off of Centralia Road and became stuck on a sand-paved side street. Hildwin's testimony did not, however, explain the tire tracks in the pine forest or why a piece of door molding from the victim's car and the other items were located 300 feet away from the closest road. In addition, Hildwin continued to deny stealing the victim's purse, despite its proximity to his home.

The State also called two witnesses who testified about Hildwin cashing a check on the afternoon of the murder. Alisa Kiker, who was working as a teller that day, identified Hildwin as the man who cashed the check purportedly written by the victim. In order to cash the check, Hildwin presented his driver's license and provided Kiker with a phone number and Social Security number. Kiker further explained that Hildwin pulled into the drive-in window between 12:30 p.m. and 1 p.m. and was driving a "brownish" Chevrolet with three taillights. When shown a photograph of the victim's car, Kiker stated that the taillights were consistent with the ones on the car driven to the bank by Hildwin. Rebecca Harrington testified that between 12 p.m. and 1 p.m. on September 9, 1985, she was at the bank with her grandmother. Harrington explained that while waiting for

her grandmother to make a mortgage payment and check her blood pressure on a machine in the bank lobby, Harrington looked out the window of the bank and could see a car at the drive-in teller. Harrington testified that she noticed that the car had a sunroof and identified Hildwin as the man that she saw driving. Hildwin's car did not have a sunroof, but the victim's car did. Moreover, the victim's car was found stuck in the mud near Labrador Duck Road. The car appeared to have been driven north and east, as Hildwin would have driven to return home from the bank. Overall, this evidence established that Hildwin drove the victim's then late-model, brown 1984 Chevrolet Cavalier—not his own blue 1974 Chevrolet Malibu—to the bank.

Finally, the State called a witness who testified that he heard Hildwin confess to committing a murder. Robert Worgess testified that in November 1985, he was housed in the same area of the Hernando County Jail as Hildwin. Worgess explained that after reading a book called "Maximum Security," Hildwin stated, "They're going to fry my ass." In response to this comment, Worgess asked Hildwin if "he kill[ed] her," and Hildwin answered: "Yes, I did." Worgess stated that Hildwin then added: "I stabbed her first." While the State primarily argued that Hildwin strangled the victim, Worgess's testimony did not conflict with the physical evidence. The medical examiner who testified at Hildwin's trial stated that the injuries to the victim were consistent with strangulation and that there was

also a "superficial laceration or tearing-type" injury just below the victim's neck, but he was not able to determine whether it was "a tearing or cutting-type of wound."

For the reasons explained above, the newly discovered DNA evidence would not likely result in an acquittal. Nor would the newly discovered evidence have any effect on Hildwin's sentence. As this Court explained in its decision regarding Hildwin's initial motion for postconviction relief, the "secretor/non-secretor evidence was not presented at the resentencing" and the sentencing judge did not rely on any evidence of a sexual battery in finding the aggravating factors that: (1) the murder was committed for pecuniary gain; (2) the murder was especially heinous, atrocious, or cruel; (3) Hildwin had been previously convicted of a violent felony; and (4) Hildwin was under sentence of imprisonment at the time of the murder. Hildwin, 951 So. 2d at 790. Because the now discredited evidence did not contribute to Hildwin's original death sentence, Hildwin has not established that he would likely receive a life sentence on retrial.

In conclusion, I would affirm the postconviction court's order denying relief. The new DNA evidence does not create reasonable doubt about Hildwin's culpability and would not probably result in a lesser sentence. There is no basis for vacating his conviction and sentence and ordering a new trial nearly thirty years after the crimes occurred. Therefore, I dissent.

POLSTON, C.J., concurs.

An Appeal from the Circuit Court in and for Hernando County,
    Richard Tombrink, Jr., Judge - Case No. 85-499-CF

Martin J. McClain of McClain & McDermott, P. A., Wilton Manors, Florida; and
Nina Morrison of the Innocence Project, Inc., New York, New York,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Mitchell D. Bishop,
Assistant Attorney General, Daytona Beach, Florida,

    for Appellee